942 So.2d 484 (2006)
STATE of Louisiana
v.
Allen SNYDER.
No. 1998-KA-1078.
Supreme Court of Louisiana.
September 6, 2006.
Rehearing Denied December 15, 2006.
*485 Capital Appeals Project, Jelpi P. Picou, Jr., Marcia A. Widder, Aneel L. Chablani, for applicant.
Charles C. Foti, Jr., Attorney General, Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, James A. Williams, Alfred A. Olinde, Jr., Assistant District Attorneys, for appellee.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES
*486 WEIMER, Justice.[*]
Defendant was convicted of first degree murder and sentenced to death. On direct appeal, this court ultimately affirmed defendant's conviction and sentence. Currently, the case is on remand from the United States Supreme Court, which directed that we again review defendant's Batson claims, this time in light of Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). After reviewing defendant's Batson complaints cumulatively in light of the entire record as directed by Miller-El, we find the trial court did not err in determining the veni-repersons were not excused by the State in a racially discriminatory manner. Therefore, for the reasons that follow, the judgment affirming defendant's conviction and sentence is reinstated.

FACTS AND PROCEDURAL HISTORY
Defendant was indicted in Jefferson Parish for the first-degree murder of Howard Wilson.[1] On June 28, 1996, defense counsel was notified in writing that the State was seeking the death penalty. A trial was subsequently held. During voir dire, defendant charged that the State exercised several of its peremptory challenges against African-American prospective jurors in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court denied defendant's Batson challenges. Consequently, defendant, who is African-American, was tried by an all-white jury. On August 29, 1996, the jury found defendant guilty as charged. After finding the presence of one aggravating circumstance,[2] the same jury unanimously determined defendant should receive the death penalty. The trial court subsequently imposed a sentence of death.
Defendant appealed his conviction and sentence directly to this court pursuant to La. Const. art. V, § 5(D), which provides that a case shall be appealable to the supreme court if the defendant has been convicted of a capital offense and a penalty of death actually has been imposed. This court reviewed defendant's Batson claims and concluded the trial court did not abuse its discretion or err in its denial of the claims. State v. Snyder, 98-1078, p. 11 (La.4/14/99), 750 So.2d 832, 842 (Snyder I). Thus, we conditionally affirmed defendant's conviction and sentence, but remanded the case to the trial court for a retrospective determination of defendant's competency at the time of trial, if one could be made. Id., 98-1078 at 43, 750 So.2d at 863.
Following our remand, the trial court held a bipartite hearing to determine whether a nunc pro tunc ruling could be made with respect to defendant's competency at the time of trial and whether defendant was competent to proceed with trial. The trial court ruled that a retrospective determination of defendant's competence was possible and that defendant was competent at the time of trial. Defendant appealed these rulings to this court. *487 Upon finding the trial court complied with procedural due process requirements and the testimony and evidence supported the trial court's determination of competency, this court unconditionally affirmed the judgment of the trial court and sentence of death. State v. Snyder, 98-1078, p. 11 (La.4/14/04), 874 So.2d 739, 745 (Snyder II).
Subsequently, the Supreme Court of the United States granted defendant's petition for a writ of certiorari, vacated the judgment of this court, and remanded the case for further consideration in light of Miller-El, 545 U.S. 231, 125 S.Ct. 2317.[3]Snyder v. Louisiana, ___ U.S. ___, 125 S.Ct. 2956, 162 L.Ed.2d 884 (2005).

LEGAL PRECEPTS
The Equal Protection Clause of the United States Constitution prohibits engaging in purposeful discrimination on the grounds of race in the exercise of peremptory challenges. Batson, 476 U.S. at 89, 106 S.Ct. at 1719. The Miller-El decision that forms the basis for this remand was the third in a trilogy of Supreme Court opinions related to the allegedly discriminatory exercise of peremptory challenges in criminal trials. The trilogy presents a pendulous treatment by the Court of the issue of the evidentiary burden placed on a criminal defendant who claims that equal protection has been denied through the State's use of peremptory challenges to exclude individuals from the petit jury on the basis of race.
In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court recognized that a State's purposeful or deliberate denial of participation as jurors on account of race violates the Equal Protection Clause. Reviewing the "very old credentials" of the peremptory challenge system, the Court noted the "long and widely held belief that peremptory challenge is a necessary part of trial by jury." Id., 380 U.S. at 219, 85 S.Ct. at 835. The majority of the Court sought to accommodate both the prosecutor's historical privilege of peremptory challenge free of judicial control and the constitutional prohibition on exclusion of persons from jury service on account of race. Because the State may not exercise its challenges in contravention of the Equal Protection Clause, the Court held it was impermissible for a prosecutor to use challenges to exclude African-Americans from the jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny to them "the same right and opportunity to participate in the administration of justice enjoyed by the white population." Id., 380 U.S. at 224, 85 S.Ct. at 838. Thus, proof by a defendant that members of his race were struck from his jury was insufficient; a defendant's burden was to show the circumstances under which prosecutors were responsible for striking minority jurors beyond the facts of a particular case. Id. 380 U.S. at 223-228, 85 S.Ct. at 838-840. Proof of repeated striking of African-Americans over a number of cases *488 was necessary to establish a violation of the Equal Protection Clause.
Twenty-one years after Swain, the Court swung the pendulum in the opposite direction, finding that the evidentiary formulation of Swain was inconsistent with standards that had developed during those years for assessing a prima facie case under the Equal Protection Clause. In Batson, 476 U.S. at 92-93, 106 S.Ct. at 1721, the Court called the Swain requirement "a crippling burden of proof" that had made prosecutors' peremptory challenges "largely immune from constitutional scrutiny." The Court held that a defendant could establish a prima facie case of purposeful discrimination in the selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. Evidence of a pre-existing pattern of discrimination in previous cases was no longer required.
Another 19 years later, in Miller-El, the Supreme Court moved the pendulum back toward middle ground. Stating that although the move from Swain to Batson left a defendant free to challenge the prosecution without having to cast Swain's "wide net," the Court noted the net should not have been consigned to history; Batson's individualized focus had an inherent weakness of its own caused by its very emphasis on the particular reasons a prosecutor might give. "If any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain." Miller-El, 545 U.S. at 240, 125 S.Ct. at 2325. Thus, the Court reiteratedthis time in a habeas proceeding[4]Batson's explanation that a defendant may rely on "all relevant circumstances" to raise an inference of purposeful discrimination. Id.[5]
Nevertheless, the Court left the Batson test intact in Miller-El and reaffirmed that position in Rice v. Collins, ___ U.S. ___, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). Louisiana law codifies the Batson ruling in LSA-C.Cr.P. art. 795(C), which provides:
No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the *489 objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
The race-neutral explanation need not be persuasive or even plausible. Collins, ___ U.S. at ___, 126 S.Ct. at 973-974, quoting Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge. State v. Tyler, 97-0338, p. 3 (La.9/9/98), 723 So.2d 939, 942, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999). The trial court's findings with regard to a Batson challenge are entitled to great deference on appeal. Id. at 4;[6]see also, State v. Juniors, 03-2425, p. 28 (La.6/29/05), 915 So.2d 291, 316. When a defendant voices a Batson objection to the State's exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor's race-neutral explanations to be credible. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Miller-El v. Cockrell, 537 U.S. 322, 339, 123 S.Ct. 1029, 1040, 154 L.Ed.2d 931 (2003).
The three-step Batson process which guides the courts' examination of peremptory challenges for constitutional infirmities has recently been described again by the Supreme Court as follows:
A defendant's Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]
Collins, ___ U.S. at ___, 126 S.Ct. at 973-74.
The Court's decision in Miller-El, 545 U.S. 231, 125 S.Ct. 2317, a multifaceted and fact-bound opinion on the merits of defendant's claim to habeas relief, further *490 clarifies the analysis to be used in Batson's third and final step.[7] Although the case is a federal habeas case, it nevertheless indicates the type of evidence to be considered and the appropriate scope of an evaluation of the prosecutor's reasons to be applied by the trial court at the time a Batson challenge is raised, which are later pertinent to direct review by the appellate courts.
The Miller-El opinion begins by recognizing Batson's weakness is its "very emphasis on the particular reasons a prosecutor might give." Miller-El, 545 U.S. at 240, 125 S.Ct. at 2325. The Court continued, "Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand." Id. Miller-El, therefore, redirects attention to "Batson's explanation that a defendant may rely on `all relevant circumstances' to raise an inference of purposeful discrimination," Id., and to the trial judge's duty under Batson "to assess the plausibility" of the prosecutor's proffered reason for striking a potential juror "in light of all evidence with a bearing on it." (Emphasis supplied.) Id., 545 U.S. at 252, 125 S.Ct. at 2331.[8]
In stating that the trial court must evaluate the prosecutor's proffered reasons to determine whether they are pretextual for a discriminatory intent, the Court made it abundantly clear that while a prosecutor might have some difficulty explaining his strikes that are oftentimes based on instinct, he simply must attempt to put his feelings into words. A trial court cannot overrule the Batson challenge merely because the court itself can envisage a raceneutral reason that could explain the use of a peremptory challenge against that individual. In this regard, the Court plainly stated that when "illegitimate grounds" such as race are in issue, a prosecutor simply must state his reasons "as best he can and stand or fall on the plausibility of the reasons he gives." Id., 545 U.S. at 252, 125 S.Ct. at 2332.[9]
*491 After a detailed discussion of all the evidence presented in support of defendant's Batson challenge, the Court concluded that the totality of the evidence showed the trial court was unreasonable and erroneous in determining the prosecutor's strikes of two potential jurors were not racially motivated. The Court summarized the myriad pieces of evidence that together yielded its decision. The Court found the existence of several disturbing factors that together indicated the prosecution's proffered race-neutral reasons were mere pretext for discriminatory intent: (1) the "bare statistics," which showed that out of 20 black members of the 108-person venire panel, only 1 served, Id., 545 U.S. at 240, 125 S.Ct. at 2325; (2) a "comparative juror analysis," or a side-by-side comparison, of some African-American panelists who were struck and white panelists who were allowed to serve, Id., 545 U.S. at 239-53, 125 S.Ct. at 2325-32; (3) the "broader patterns of practice" that occurred during jury selection, which included inexplicable jury shuffling[10] and disparate questioning of African-American and non-African-American panelists, Id., 545 U.S. at 252-62, 125 S.Ct. at 2332-38; and (4) historical evidence that the particular District Attorney's office involved in the case had for decades followed a known, formal, and specific policy of systematically excluding African-Americans from juries, Id., 545 U.S. at 262-66, 125 S.Ct. at 2338-39. The Court readily acknowledged that the significance of some of the evidence of discriminatory intent was "open to judgment calls," but reasoned that when the evidence was viewed cumulatively, it was "too powerful to conclude anything but discrimination." Id., 545 U.S. at 265, 125 S.Ct. at 2339.
The Miller-El opinion does not dwell on the trial court's credibility determination in favor of the prosecution. However, the Court's next Batson-third-step case, Collins, illustrates the difficulties courts face in attempting to review a trial court's resolution of a Batson challenge. In that case, a Batson challenge was made after the prosecution struck a young, African-American female panelist, and the challenge was rejected by the state courts and the federal district court. However, when defendant sought collateral habeas corpus relief in the federal courts, the Ninth Circuit Court of Appeals reversed on grounds that the trial court had acted unreasonably by crediting the prosecutor's race-neutral reasons for striking the juror. Collins v. Rice, 348 F.3d 1082 (9 Cir.2003), amended and superseded by, 365 F.3d 667 (9 Cir. 2004).
*492 The Supreme Court reversed, finding the Court of Appeals had "improperly substituted its evaluation of the record for that of the state trial court." Collins, ___ U.S. at ___, 126 S.Ct. at 973. The Court found the record did not demonstrate that a reasonable factfinder must necessarily conclude the prosecutor lied about his reasons for striking the panelist. Id. at 975.
Thus, the most recent admonition by the Supreme Court on jury selection after Batson focuses, not on a reviewing court's stringent parsing of a prosecutor's raceneutral reasons to ferret out pretext masking discriminatory intent, but on the leeway a reviewing court must grant a trial court in its evaluation of the credibility of the prosecutor in the third step of the Batson analysis. One clear difference between Collins and Miller-El is that there was no evidence that issues of race pervaded the entire voir dire in Collins. Furthermore, there was nothing beyond the four corners of the Collins voir dire to cause the Court to question the sincerity of the prosecutor's challenges.
Notwithstanding the differences and similarities of Miller-El and Collins, the focus of the Batson framework is "to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." Johnson v. California, 545 U.S. 162, 172, 125 S.Ct. 2410, 2418, 162 L.Ed.2d 129 (2005) (Permissible inferences of discrimination were sufficient to establish a prima facie case of discrimination, which satisfied the first Batson step.) While Miller-El indicates the type and quantum of evidence to be considered at Batson's third step, Miller-El, Collins, and Johnson add no new elements to the venerable Batson analysis. See Murphy v. Dretke, 416 F.3d 427, 439 (5 Cir.2005) ("The Court did not announce any new elements or criteria for determining a Batson claim, but rather simply made a final factual and evidentiary determination of that particular petitioner's Batson claim."); Amanda S. Hitchcock, "Deference Does Not By Definition Preclude Relief": The Impact of Miller-El v. Dretke on Batson Review in North Carolina Capital Appeals, 84 N.C. L.Rev. 1328, 1330 (2006). Consequently, while Miller-El requires a somewhat expanded review of defendant's Batson claims, we perform our review pursuant to the typical Batson framework and the Louisiana constitutional and statutory provisions.

APPLICATION OF PRINCIPLES
Miller-El and Collins necessarily shape this court's response to the Supreme Court's present remand order and our reconsideration of the Batson issue, but do not require a detailed reconsideration of the voir dire of the five African-American prospective jurors peremptorily struck by the State. As we stated in Snyder I, the State's use of five of its peremptory challenges to strike African-American prospective jurors who survived challenges for cause resulted in defendant's being tried by an all-white jury.[11] Now defendant re-argues that the State's use of "close to half" of its peremptory strikes to "exclude an entire group comprising only fourteen percent of the qualified pool" is *493 compelling evidence that the State's strikes were made on the impermissible basis of race.
Considering this argument, this court's current task is eased by an initial winnowing out of some of the challenged jurors. Currently, defense counsel makes no argument with regard to Loretta Walker, almost certainly because the record offers ample affirmative support for the prosecutor's challenge.[12]
With respect to two other prospective jurors, Greg Scott and Thomas Hawkins, Jr., this court previously found that the defendant waived any Batson claim on appeal by failing to object when the prosecutor struck the jurors, although defense counsel noted their race for the record. More importantly, defense counsel did not ask the prosecutor to articulate his raceneutral reasons for excusing Greg Scott and Hawkins when the Batson challenge was posed after the State struck Elaine Scott from the third panel of prospective jurors. Snyder, 98-1078 at 7-8, 750 So.2d at 839-40.[13] There is nothing in Miller-El or Collins that casts doubt on the correctness of this portion of Snyder I.
Despite defense counsel's reiteration of the argument concerning the remaining two potential jurors, we turn to our previous decision regarding these persons:
Defense counsel did . . . lodge the proper Batson objections to the State's use of peremptory challenges against potential jurors Jeffrey Brooks [and] Elaine Scott. . . . The State originally accepted Brooks as a juror, but later backstruck him. The prosecutor's reasons for striking Brooks were that he appeared "very nervous" throughout questioning and that he would be missing class, as a student teacher, if chosen to serve on the jury. The prosecutor stated, "He's a student teacher. My main concern is for that reason, that being that he might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase."[[14]] Defense counsel responded by stating:

*494 His main problem yesterday was the fact that he didn't know if he would miss some teaching time as a student teacher. The clerk called the school and whoever it was and the Dean said that wouldn't be a problem. He was told that this would go through the weekend, and he expressed that that was his only concern, that he didn't have any other problems.
As far as him looking nervous, hell, everybody out here looks nervous.
I'm nervous.
The court allowed the State to exercise a peremptory challenge on Brooks.
With respect to prospective juror Elaine Scott, the district attorney excused her, stating, "I observed she was very weak on her ability to consider the imposition of the death penalty. Her words, exactlyI wrote it down, that she thinks she could, and that's the reason for our challenge." However, when asked again by the prosecution if she could impose the death penalty, she responded, "I could." She also responded affirmatively when asked if she could listen to the evidence and consider whether to accept or reject the insanity defense and hold the defense to its burden of proof. Nevertheless, the trial court accepted the State's explanation as race neutral and excused Elaine Scott.
. . . .
The trial court entertained the State's race neutral reasons for the exclusions without making a finding as to whether defendant had made a prima facie showing of purposeful racial discrimination. A trial court's "demand that a prosecutor justify his use of peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose." State v. Green, 94-0887, p. 25 (La.5/22/95), 655 So.2d 272, 288. Nevertheless, the issue of whether the defense established a prima facie case of discrimination is moot once the prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination. Id. (applying Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). Nonetheless, any response will qualify as race neutral "unless a discriminatory intent is inherent in the prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
Here, the trial court did not find that defendant had established purposeful discrimination and overruled the Batson objections. These rulings appear correct. Although not required by the caselaw, the State's proffered reasons were plausible, supported by the record and race-neutral. [Citations omitted.] The prosecutor's reasons constituted "legitimate" grounds for the exercise of a peremptory strike. [Citation omitted.] None of the reasons articulated by the State are readily associated with the suspect class that is alleged to be the object of the State's discriminatory use of peremptory challenges. Defendant, the opponent of the strikes, offered no facts or circumstances supporting an inference that the State exercised its strikes in a racially discriminatory manner. Therefore, the defendant's proof, when weighed against the prosecutor's offered race-neutral reasons, was not sufficient to prove the existence of discriminatory *495 intent. See State v. Green, 94-0887 at p. 27, 655 So.2d at 289.
After carefully reviewing the entire record of voir dire, we find no abuse of discretion or error by the trial court in its denial of defendant's Batson claims. The trial court heard the prospective jurors and concluded there were reasonable bases for the challenges in question. The record does not show that the State employed a tactic of purposeful discrimination in its exercise of peremptory challenges. [Record references and footnote omitted.]
Snyder, 98-1078 at 9-11, 750 So.2d at 840-842.
Contrary to defense counsel's argument on remand,[15] we do not read the Supreme Court's remand as a "rejection of the analysis performed" in Snyder I with regard to defendant's "claim that the prosecutor in his case was illegally removing African-American venire persons based on their race in violation of Batson." Although the Supreme Court vacated the judgment and ordered reconsideration in light of Miller-El, we view the remand as a mere expansion of our review, not a rejection of the analysis made solely on a careful review of "the entire record of the voir dire." Snyder, 98-1078 at 11, 750 So.2d at 842.
Nevertheless, we have conducted another review of the voir dire transcript and find nothing there to disparage the above quoted Batson analysis conducted by this court in Snyder I. Indeed, our review uncovered a factor favorable to the State's use of a peremptory challenge to backstrike Brooks that was not mentioned in Snyder I.
At the beginning of the voir dire, the trial court gave a brief explanation of the jury selection process. The court announced the eligibility requirements for jury service and then asked the members of the venire who had any basis for disqualification or a significant reason that would warrant excusal to approach the bench. Each venire member approached the bench individually and provided his or her reason for ineligibility or for excusal. Some persons were questioned further by the State or the defense as to their reasons, and then the court either excused them or denied their requests.
During this preliminary voir dire process, the State consistently inquired of a potential juror whether or not his or her particular problem would prevent concentration on the evidence so as to impair the juror's decision-making task. For example, when speaking to potential juror Chauffe, a single-mother of a school-aged child who claimed transportation problems, the prosecutor asked: "If you got selected on this jury anyway, despite what you're telling us, do you think that you would be able to pay attention to the evidence in the case, and listen to the Judge, and be a good juror? Or do you feel you would be worrying too much and not be able to listen to the evidence?" When Chauffe answered the second question affirmatively, the court excused her. The prosecutor asked the same type of question of prospective jurors Pickett, Nguyen, Laws, Perkins, and Miller.
Later, when the State exercised a peremptory challenge to backstrike Brooks, the race-neutral reason given was the prosecutor's reservations about this student teacher's ability to consider the issues *496 without being distracted by his concerns about school. This reason was consistent with the concern voiced in the questioning of other potential jurors during the prevoir dire process mentioned above.
Further, acknowledging that the peremptory challenge of Brooks requires a more detailed discussion than the challenge of Scott, we note defense counsel's comparison of the State's challenge of Brooks with the State's acceptance of Yeager and Sandras,[16] both white males on the fifth panel.[17] Yeager expressed concern with jury service because he had a commitment to an event scheduled for Sunday that he had been an integral part of for many years. Sandras reported he taught at the University of New Orleans, had just begun the semester, and would have a problem with any "prolonged absence." We note that both of these men were employed and apparently already had established careers; Brooks, on the other hand, was attempting to complete his college courses in order to begin a career in teaching.
The fact that Brooks actually approached the bench on his own volition and raised his teaching obligations as a hardship excuse indicates he was truly concerned, more so than Sandras and Yeager. When Brooks approached the bench to raise a hardship concern at the beginning of the jury selection proceeding, Brooks stated to the court that "there is something I'm missing right now that will better me towards my teaching career." On the other hand, Sandras and Yeager merely responded to defense counsel questioning posed to their panel regarding any jurors' personal reasons or pre-existing obligations which would make it difficult to concentrate or serve on the jury. Thus, Brooks initiated the concern about the trial being a hardship, while Sandras and Yeager merely responded to questions.
Defense counsel also would have us dismiss the State's claim that Brooks appeared nervous because certain questions Brooks asked during voir dire did not indicate nervousness. However, the fact that Brooks was articulate during the voir dire may have contributed to the prosecutor's fear that he would get "smart" during jury deliberation and suggest a verdict lesser than the death penalty. See Footnote 14, supra. Additionally, nervousness cannot be shown from a cold transcript, which is why only the trial judge can evaluate the demeanor of the juror and why the judge's evaluation must be given much deference. In Collins, the Supreme Court found that the Ninth Circuit had been too aggressive in its review and in its ultimate ruling which reversed the trial court's Batson rulings. The Supreme Court concluded the Ninth Circuit had improperly substituted its evaluation of the record for that of the state trial court. Collins, ___ U.S. ___, 126 S.Ct. at 973, 163 L.Ed.2d 824.
*497 There was no indication that race was the underlying reason for backstriking Brooks any more than race was a consideration in the prosecutor's questions to the other potential jurors. See State v. Harris, 01-0408, p. 8 (La.6/21/02), 820 So.2d 471, 476 (The comparison of the treatment of the potential jurors of different races has been utilized by this court in a measurement of the racially-neutral reason for the exercise of the prosecution's challenge.)
The final part of our analysis is based on a review of the record as a whole as instructed by the Supreme Court in Miller-El, 545 U.S. at 240, 125 S.Ct. at 2325, 2331 ("[A]ll relevant circumstances" and "all evidence with a bearing" on the Batson issue must be considered.) First, we consider the proceeding at which the issue of racial prejudice was raised prior to the beginning of voir dire.
At a July 29, 1996 hearing to determine whether the State would be permitted to introduce at trial evidence of five incidents of domestic violence allegedly committed by defendant against his estranged wife to show defendant's motive and intent, the State made reference to "another case that was on television everyday for the last couple of years . . . where this very thing happened."[18] Thereafter, on August 16, 1996, defense counsel filed a motion in limine specifically requesting the State be precluded at trial from referring to or making comparisons with O.J. Simpson or his trial, as such references would serve no purpose other than to confuse and prejudice the jury. The prosecutor responded:
I think [the defense motion is] premature. . . . I can assure the Court that I'm not going to get up in my opening voir dire and say [that] "we're here for the Jefferson Parish O.J. Simpson . . . case." I have no intentions of doing that. I have noperhaps in argument, I don't know.
. . . .
I have given the Court my word that I will not, at any time during the course of the taking of evidence or before the jury in this case, mention the O.J. Simpson case. . . . I just ask [the court] not to grant this motion.
After the hearing,[19] the trial court denied defendant's motion based on the prosecutor's representations.
*498 Voir dire began against this backdrop on August 27, 1996.
Next, we note that the State did, in fact, make an indirect reference to the O.J. Simpson case during its rebuttal argument at the penalty phase of the trial. Because the reference was made during rebuttal, the reference was preceded by the following argument of defense counsel:
[S]ome of the mitigating circumstances that we believe we've been able to demonstrate to you . . . [relate to] whether Mr. Snyder was under extreme emotional or mental influence at the time of this particular incident. . . . I really didn't have to do much to show facts that might suggest that, because the State, when they put on their case, . . . the officer from Kenner . . . said that when he found Allen Snyder a couple of hours or 12 hours or so after this incident, he was curled up in a fetal position. He was suicidal. He kept saying, "They're coming to get me. They're coming to get me." . . . [T]here's never been any indication that Mr. Snyder was somehow staging that particular incident in order to get himself a better situation or a better sentence or to help himself out in any way.
The testimony of that officer was accurate and it was truthful. The other thing that he testified to was that that house was in shambles. The furniture was strewn all about. Furniture was put up . . . doors were barricaded. The furniture was being used as a barricade. . . . I'll ask you if that is not suggestive of some sort of [mental] disturbance.
The portion of the State's rebuttal argument that the defendant now complains about was in direct response to the above quoted argument. Specifically, the prosecutor stated:
It's been very clear, and this is the last thing I'm going to say about Allen Snyder, that the kind of person he is, as Mr. Olinde described him in his opening statement, he's egocentric, and he has shown no remorse. More than that, as he stabbed his wife 15 times, put her through what Dr. Harkness described as a near-death experience, as she lay there gushing blood, as Mary Snyder sat in that seat right there, he left her there, he left her there to die. And when Detective Labat took the statement from him 12 hours later, . . . not a word at any time where you would have heard him, how's my wife? Is she okay? Not a word. Is that because he's depressed or because he's got a far deeper problem?
Brief mention. Mr. Vasquez tried to describe this man as being the man whoAnd it was 12 hours later when he called the Kenner Police Department, huddled up, claiming that he was suicidal, barricaded himself in the house. That made me think of something. Made me think of another case, the most famous murder case in the last, in probably recorded history, that all of you all are aware of[At this point in the rebuttal argument, defense counsel voiced an objection, and both counsel approached the bench. The prosecutor argued the reference to the O.J. Simpson case was fair based on the similarities between what Synder did and what Simpson did, specifically pretending to be suicidal. The trial court overruled the defense objection.]
The most famous murder case . . . happened in California very, very, very similar to this case. The perpetrator in that case claimed that he was going to *499 kill himself as he drove in a Ford Bronco and kept the police off of him, and you know what, he got away with it. Ladies and Gentlemen, is it outside the realm of possibility that that's not what that man was thinking about when he called in and claimed that he was going to kill himself?
In brief to this court, defense counsel urges this court to consider that the prosecutors selected an all-white jury as a means of playing their "O.J. card, an argument that persuaded two members of the court, Justices Johnson and Lemmon, to dissent from the majority decision." See Snyder, 98-1078 at 3, 750 So.2d at 864 (Lemmon, J., concurring in part and dissenting in part) ("I find compelling the rhetorical question by defense counsel in oral argument before this court, asking whether the prosecutor would have ranted about O.J.'s getting away with it if he had not backstruck the only black juror toward the end of voir dire.")
However, other than suggesting inferences to be drawn from the bare facts of the prosecutor's remarks both prior to and subsequent to the voir dire, defense counsel points to no evidence in the record to substantiate defendant's claim of discriminatory use of the peremptory challenges. The inferences defense counsel suggests are no more compelling than other race neutral inferences to be drawn when one considers the prosecutor's remarks in context. The remark at the motion in limine referred to the fact that the Simpson trial involved alleged domestic violence; the remark during rebuttal referred to the fact that Simpson feigned suicidal intent. Neither remark referred to Simpson's or Snyder's race. Counsel's citations to authorities concerning the Simpson trial never were, and are not now, part of the record before this court for review.
Miller-El directs that we cumulate all relevant items tending to point to racial discrimination and view them together when considering whether the trial court's determination of the existence of discrimination is clearly erroneous. Nevertheless, Miller-El directs that this court examine the precise reasons given by the State for its strike of Scott and Brooks. This court cannot attempt to hypothesize another reason that the State may have had for its strikes. As stated by the Court, the State must "stand or fall on the plausibility of the reasons he gives." Miller-El, 545 U.S. at 252, 125 S.Ct. at 2332. Consequently, we find that when the entirety of the record of defendant's case is reviewed, the record shows that the prosecution's stated reasons for striking Scott and Brooks were not pretextual. A review of this record compels a conclusion that race did not play an impermissible role in the exercise of these strikes.
When we view the totality of the evidence discussed herein, as Miller-El directs, despite the lack of the trial court's active participation in voir dire and its failure to articulate particularized reasons for its determination that the State's proffered reasons were not pretextual, we find the trial court's decision to allow the strikes of Scott and Brooks was not clearly erroneous. Considering the evidence in the record before us, a contrary conclusion would be an improper substitution of this court's evaluation for that of the trial court similar to that struck down in Collins, ___ U.S. ___, 126 S.Ct. at 973, 163 L.Ed.2d 824. The record before us simply does not demonstrate that a reasonable factfinder must necessarily conclude the prosecutor lied about his reasons for striking Scott or Brooks. Applying Miller-El and Collins, the prosecutor's demeanor was evaluated by the trial court which found no discriminatory intent. The explanations were reasonable *500 and the proffered rationale had some basis in accepted trial strategy.
We conclude defendant did not carry his ultimate burden of persuasion that the State exercised peremptory challenges in a purposefully discriminatory manner. We reiterate that Snyder's "proof, when weighed against the prosecutor's offered race-neutral reasons, was not sufficient to prove the existence of discriminatory intent." Snyder, 98-1078 at 11, 750 So.2d at 842.
Accordingly, we reinstate the following decree.

DECREE
In accordance with the above reasons assigned by this court, we unconditionally affirm the judgment of the trial court and the sentence of death. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that court denies his petition for certiorari; and either (a) the defendant, having filed for or and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSAR.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
KIMBALL, J., dissents and assigns reasons.
CALOGERO, C.J., dissents for reasons assigned by KIMBALL, J.
JOHNSON, J., dissents and assigns reasons.
KIMBALL, J. dissenting.
I believe that a review of the entirety of this record performed using the vigorous analysis directed by the Miller-El Court reveals the trial court erred in allowing the State to peremptorily challenge Mr. Brooks. Consequently, I dissent from the majority's conclusion that defendant did not prove the State exercised peremptory challenges in a purposefully discriminatory manner.
At the outset, the raw numbers characterizing the selection of defendant's jury must be noted as they were in Miller-El. The State used five of its peremptory challenges to strike 100 percent of the African-American prospective jurors who survived challenges for cause. This resulted in defendant being tried by an all-white jury. Defendant argues that the State's use of "close to half" of its peremptory strikes to "exclude an entire group comprising only fourteen percent of the qualified pool" is compelling evidence that the State's strikes were made on the impermissible basis of race. While the fact that prosecutors used their peremptory strikes to exclude 100 percent of the eligible African-American panelists does not prove intentional racial discrimination, Miller-El cautions that "`[h]appenstance is unlikely to produce this disparity.'" Miller-El, 545 U.S. at 241, 125 S.Ct. at 2325 (quoting Miller-El v. Cockrell, 537 U.S. 322, 342, 123 S.Ct. 1029, 1042, 154 L.Ed.2d 931 (2003)). See also State v. Trotter, 280 Kan. 800, 127 P.3d 972, 981 (2006) ("[T]he *501 trial court must avoid placing a determinative emphasis on any one factor. Although the trial court can objectively compare numbers or other facts, it must subjectively evaluate the credibility of the prosecutor as he or she explains the reasons for each challenged strike.").
As explained by the majority, voir dire began against a backdrop of the issues of race and prejudice when the State made reference to the O.J. Simpson case. Following defendant's protests, the prosecutor assured the court that he would not refer to O.J. Simpson during the voir dire and evidentiary portion of trial. However, these representations appear disingenuous because the prosecutor clearly referenced the O.J. Simpson case during its rebuttal argument at the penalty phase of the trial.
Considering this injection of racial issues, and the fact that the prejudicial arguments were made to an all-white jury, I believe it is only reasonable to conclude that Mr. Brooks was peremptorily challenged by the State on the basis of his race when the entirety of the facts is considered. This is especially true in light of the fact that the trial court did not articulate its reasons for overruling the Batson challenge. While one may infer that the trial court found the State's reasons credible, this court, on appellate review, is not privy to the reasons for this credibility determination. One simply cannot tell whether it was something in the demeanor of the prosecution or in the behavior or attitude of Mr. Brooks that caused the trial court to believe the State's race-neutral reasons were not pretextual. The backstrike of Mr. Brooks followed the Batson-challenged peremptory strike of Ms. Scott, which had excluded the third of four African-American panelists to be examined. The State's backstrike of Mr. Brooks then removed the only African-American juror the State had accepted for service. With these circumstances as a backdrop, which Miller-El teaches are clearly relevant to the Batson analysis, the State's exercise of a peremptory challenge is suspicious.
The suspicions raised by the circumstances surrounding the exercise of the backstrike are not eased when the voir dire of Mr. Brooks is considered alone or when it is considered along with that of other panelists. The prosecutor stated he struck Mr. Brooks because he "looked very nervous" and the prosecutor was concerned that Mr. Brooks would vote in a way to avoid a penalty phase in order to go home quickly and miss less student teacher observation. However, the record reveals that when the trial court informed Mr. Brooks at the bench that Dr. Tillman did not see a problem as long as he missed only one week, Mr. Brooks simply responded, "Okay." He did not voice any further concerns or ask any questions. When the defense pointed out that Mr. Brooks did not seem to have lingering concerns once the trial court related Dr. Tillman's response, the State did not retort or further explain this justification. Most importantly, the prosecutors did not ask one question of Mr. Brooks concerning his student teaching commitments or whether he had any lingering time-related anxieties not dispelled by the trial court's inquiries of Dr. Tillman when they subsequently questioned him. Had Mr. Brooks's concern about his student teaching commitments genuinely mattered to the State, it would seem to reason that the State would have questioned him about it to determine the extent of his concern. On this subject, the Miller-El Court quoted Ex parte Travis, 776 So.2d 874, 881 (Ala. 2000) as follows: "The State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *502 Miller-El, 545 U.S. at 246, 125 S.Ct. at 2328.
It is possible the State had genuine concern about Mr. Brooks's state of mind despite his apparent acceptance of Dean Tillman's assurances to the trial court. Collins, ___ U.S. at ___, 126 S.Ct. at 975 ("That the prosecutor claimed to hold such concerns despite Juror 16's voir dire averments does not establish that she offered a pretext."). However, there was no pre-strike foreshadowing of genuine State concern over the possibility of Mr. Brooks having time-schedule anxieties. No attempt was made by the State to verify its hypothesis and develop an objective basis for its strike. See Miller-El, 545 U.S. at 250, 125 S.Ct. at 2330-31 n. 8 ("[T]he failure to ask undermines the persuasiveness of the claimed concern."); State v. Harris, 01-0408 at p. 8, 820 So.2d at 476 ("[T]he fact that potential jurors are challenged on the basis of a claimed bias, without being questioned about such a bias, `raises a strong inference that they were excluded on the basis of race alone.'") (quoting Williams v. State, 548 So.2d 501, 507 (Ala.Cr.App. 1988)).
The second justification the prosecutor gave for striking Mr. Brooks was that he "looked very nervous." Later, another prosecutor added that he was "very uncertain." Defense counsel immediately challenged the State's characterization of Mr. Brooks's demeanor, stating "[E]verybody out here looks nervous. I'm nervous." Cf. State v. Hobley, 98-2460, p. 21 (La. 12/15/99), 752 So.2d 771, 784 ("Notably, trial counsel neither disputed the explanations of inattentiveness given by the prosecutor nor developed a record of evidence contradicting those explanations."). This can be taken to mean that, in defense counsel's view, Mr. Brooks looked no more nervous than any other panelist and was not unusually nervous-looking. The State did not respond to the challenge of its proffered reason by providing examples of Mr. Brooks's alleged nervousness, or by making a comparison of his alleged nervousness to the demeanor of other panelists that the State found acceptable. While it is true that the ultimate burden of persuasion on the Batson challenge remained with defendant, the State made no effort to demonstrate that its motivation for the strike was benign, or to develop a record of objective support for its characterization. This reason proffered by the State, the ensuing comment by defense counsel, and the State's lack of further justification highlight the difficulties faced by reviewing courts when the trial court does not state its firsthand observations for the record.
Without the independent assessment from the trial court verifying the accuracy of the State's generalized and conclusory characterization, the record contains no objective support for the State's demeanor-based justification. In fact, the record seems to indicate that Mr. Brooks was an engaged and voluble juror throughout voir dire examination. For example, Mr. Brooks asked defense counsel to explain the apparent contradiction between the presumption of innocence and the rule requiring a defendant to prove that he was legally insane at the time of the offense. With regard to another aspect of the presumption of innocence, a defendant's Fifth Amendment right to remain silent at trial, when defense counsel asked the panelists whether "anybody [can] think of a reason why a defendant might not testify," Mr. Brooks alone spoke up and volunteered that defendant "may say something to destroy his credibility by accident." Finally, when asked by defense counsel whether anyone on the panel had any experience with someone suffering from mental illness, Mr. Brooks explained, "I'm a future teacher, and I run into students who have *503 different problems, retardation, things like that." Answers and interactions such as these are not the kind that reasonably might be expected of someone who looked "very nervous" and "very uncertain." In the absence of the trial court's independent and particularized assessment of Mr. Brooks's demeanor, a reviewing court can only look to the record, which seems to indicate a lack of nervousness and uncertainty on the part of Mr. Brooks. Consequently, the State's proffered race-neutral reasons for striking Mr. Brooks are called into question.
The majority, relying on the Court's admonition in Collins that reviewing courts should not improperly substitute their evaluations of the record for that of the trial court, concludes that "nervousness cannot be shown from a cold transcript, which is why only the trial judge can evaluate the demeanor of the juror and why the judge's evaluation must be given much deference." At 496. In this case, however, the trial judge allowed the State's peremptory challenge of Mr. Brooks without any explanation whatsoever. In contrast, the trial court in Collins specifically stated:
With regard to 016 [the panelist at issue], the court, frankly, did not observe the demeanor of Ms. 016 that was complained of by the District Attorney; however, Ms. 016 was a youthful person, as was [a white male juror the prosecutor also dismissed by peremptory challenge]. And one or more prospective jurors also. The [c]ourt is prepared to give the District Attorney the benefit of the doubt as to Ms. 016.
Rice v. Collins, ___ U.S. ___, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006). Thus, the trial judge in Collins made particularized findings regarding the prosecutor's proffered reasons. The trial judge in the instant case made no comment regarding Mr. Brooks's demeanor or his opinion of the trustworthiness of the prosecutor's explanations, even when the defendant immediately challenged the prosecutor's characterization of Mr. Brooks's demeanor. It is true that he allowed the peremptory challenge, but we are left with nothing but conjecture regarding his reasoning in the face of contrary characterizations of Mr. Brooks's demeanor by the State and the defendant. In my view, it is this lack of particularized reasons under these circumstances that distinguishes this case from Collins.
The credibility of the State's proffered reasons is called further into question when the strike of Mr. Brooks is compared with the State's treatment of panelists who expressed similar concerns that could have caused them to vote in a way to shorten the trial if selected as a juror. After Mr. Brooks was excused, the fifth panel of prospective jurors included Michael David Sandras, a white teacher at University of New Orleans. In response to defense counsel questions related to whether any panelist had any personal reasons or pre-existing obligations that would make it difficult to serve on the jury or to concentrate during the trial, Mr. Sandras stated that the semester had just started the day before and that "any prolonged absence . . . becomes a real problem." Mr. Sandras further conceded that he might have trouble concentrating on the trial "to some extent" because he was "responsible as far as the students, obviously, and I'd have to somehow pass on the information concerning work." The State did not attempt to explore Mr. Sandras's concerns by asking followup questions. Instead, the State accepted Mr. Sandras as a juror, who was then peremptorily challenged by the defense. That the defense peremptorily struck Mr. Sandras so that he did not serve on the jury is of no moment because the defense did not make *504 the decision to strike him until after the State made the decision to accept him. See Miller-El, 545 U.S. at 245, 125 S.Ct. at 2328 n. 4 ("The fact that Witt and other venire members discussed here were peremptorily struck by the defense is not relevant to our point. For each of them, the defense did not make a decision to exercise a peremptory until after the prosecution decided whether to accept or reject, so each was accepted by the prosecution before being ultimately struck by the defense. And the underlying question is not what the defense thought about these jurors but whether the State was concerned about [their] views . . . when the venireperson was not black."). The State's complete lack of concern regarding Mr. Sandras's expressed worries about neglecting his teaching duties if he were selected to serve on the jury and its ultimate acceptance of him as a juror seem to indicate that its proffered reason for striking Mr. Brooks was pretextual and that it struck him because of his race.
Similarly, in response to the same questioning by defense counsel, Mr. Arthur Yeager, Jr., a white retired engineer, stated that he had "a longstanding commitment to an event that's going to take place on Sunday that I've been an integral part of for many years." Defense counsel informed Mr. Yeager that they should be finished by then. Mr. Yeager seemed to be appeased and stated he could make the necessary arrangements with a few telephone calls "and take care of my animals, too." The State asked no additional questions related to Mr. Yeager's concerns, and, along with the defense, accepted him as a juror.
In my view, the acknowledged time concerns of Mr. Sandras and Mr. Yaeger seem equally significant as the time concerns attributed to Mr. Brooks. The majority discounts the similarities among these potential jurors by pointing out that Mr. Brooks initiated the discussions regarding his concerns about missing his obligations, while Mr. Sandras and Mr. Yeager merely responded to questions. However, in no instance did the State question Mr. Sandras or Mr. Yeager about their admitted concern regarding the time they would spend in court, and away from their personal activities, if selected to serve on the jury. The State chose to strike only Mr. Brooks, in part because of his stated concerns about missing a portion of his student teaching duties. The similarities among Mr. Brooks, Mr. Sandras, and Mr. Yaeger, and the State's uneven treatment of these panelists does not make the State's proffered reasons for striking Mr. Brooks per se pretextual. Both Mr. Sandras and Mr. Yaeger may have exhibited legitimate traits and qualities that made the State believe they would make more desirable jurors than Mr. Brooks. See Juniors, 03-2425 at p. 31, 915 So.2d at 317-18; State v. Collier, 553 So.2d 815, 822 (La. 1989). The factor that calls the State's strike of Mr. Brooks into question is the total lack of interest prosecutors exhibited in the admitted time concerns of Mr. Brooks, Mr. Sandras and Mr. Yaeger until it needed to justify with race-neutral reasons its strike of Mr. Brooks.
Miller-El directs that appellate courts cumulate all relevant items tending to point to purposeful discrimination and view them together when considering whether the trial court's determination of the existence of purposeful discrimination is clearly erroneous. The record shows that issues of racial prejudice existed at the outset of this case when defendant attempted to foreclose the possibility of the State mentioning the O.J. Simpson trial during his own trial. Defendant was tried by an all-white jury after the State used five of its peremptory strikes to challenge *505 100 percent of the eligible African-American panelists. In the absence of the trial court's independent and objective assessment on the record of Mr. Brooks's demeanor and attitude, the record tends to belie the prosecutor's stated race-neutral reasons for striking him. Rather than seeming uncertain and nervous, Mr. Brooks appears from a reading of the cold transcript to be engaged, forthcoming and communicative. Additionally, although the State offered the fact that Mr. Brooks might want to manipulate his deliberation to cut the trial short because of his stated concerns about missing his student teacher duties as a race-neutral reason for its strike, the State did not ask Mr. Brooks one question regarding this concern. Moreover, the State accepted without question on the issue at least two panelists who voiced similar concerns and might conceivably have the same motivation for cutting the trial short. Finally, we note that the State injected race into the proceedings directly when it did, in fact, mention the O.J. Simpson case during its penalty phase argument over the defendant's objection.
When viewed in isolation, perhaps none of the factors above would constitute enough evidence to overturn the trial court's determination in light of the great deference afforded its factual determinations. However, the totality of the evidence discussed herein, combined with the lack of the trial court's active participation in voir dire and its failure to articulate particularized reasons for its determination that the State's proffered reasons were not pretextual, leads to the conclusion that the trial court's decision to allow the strike of Mr. Brooks was clearly erroneous. In my view, the cumulative evidence of pretext is compelling and too powerful to conclude anything but intentional racial discrimination motivated the State's strike of Mr. Brooks. Consequently, I would reverse defendant's conviction and sentence.
JOHNSON, Justice, dissenting and assigning reasons:
When this case was first before this court on original review in Snyder I, 98-1078 (La. 04/14/99);750 So.2d 832, I stated:
I would have more confidence in the fairmindedness of this jury and the jury's pronouncement of the death sentence, had the state not used its peremptory challenges to exclude every African American juror, resulting in an all white jury for this black defendant. In my view, this violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), coupled with the prosecutor's inflammatory and prejudicial comparison of this case to the O.J. Simpson trial, require that we set aside the death sentence and remand the case for resentencing.
The Sixth Amendment to the United States Constitution gives a criminal defendant the right to a trial by a jury of his peers. I still believe that racial discrimination in the jury selection process offends the Equal Protection Clause of the Fourteenth Amendment and a pattern of strikes against African American jurors still gives rise to an inference of discrimination. Once the inference of discrimination is present, the prosecutor then has the burden of articulating a race-neutral explanation for striking the African American jurors. The trial judge serves as the gatekeeper, ensuring that racial prejudice, which impedes the securing of equal justice, does not invade our judicial system. As the gatekeeper, the trial judge must decide whether the prosecutor has articulated a genuine concern, or whether the reason articulated is merely a guise to accomplish his/her discriminatory purpose. *506 Verbalized facially neutral reasons can be a pretext for conscious or unconscious racism.
In the present case, the prosecutor's action in accepting the first African-American juror seems to have been a tactic to keep defense counsel from raising Batson challenges to the subsequent exclusions. Nonetheless, defense counsel noted in the record which excluded jurors were African-American. The Batson challenges to the remaining three African-American jurors, including the one juror who was accepted and later backstruck, were overruled by the trial court. The trial court accepted the prosecutor's "race-neutral" explanations and the majority found them to be "plausible, supported by the record and race neutral."
The prosecutor's discriminatory intent in excluding all African-Americans from the jury was evidenced by his reference to the O.J. Simpson trial during closing arguments. In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 287, we recognized that "for a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, that result `must ultimately be traced to a racially discriminatory purpose.'" Here we have a racially discriminatory result. An all-white jury selected by peremptorily excluding the five African-Americans from the venire, and the prosecutor's racially discriminatory purpose of inflaming the jury by referring to O.J. Simpson getting away with murder in California.
Because of the nationwide media focus on O.J. Simpson, the defense made a pre-trial motion to exclude any references to the O.J. Simpson case. This motion was denied by the trial judge based on the prosecutor's assurance that he would not, at any time during the course of taking evidence or before the jury, mention the O.J. Simpson case. It is blatantly clear that the prosecutor did not intend to keep his word. The prosecutor had no need to make reference to this defendant not getting away with murder during the penalty phase of the trial. At this point, the defendant had already been convicted of the crime, so there was nothing for him to "get away with." The prosecutor utilized the O.J. Simpson verdict to racially inflame the jury's passion to sentence this defendant to death. Such tactics leave no doubt in my mind that the prosecutor had a racially discriminatory purpose for excluding the African-American jurors.
During the hearing on the pre-trial motion to exclude references to the O.J. Simpson case, the following colloquy occurred:
Prosecutor:
Now, certainly, I can assure the Court that I'm not going to get up in my opening voir dire and say, "we're here for the Jefferson Parish O.J. Simpson court-case." I have no intentions of doing that. I have no-perhaps in argument, I don't know. I don't know. It might be inappropriate, but I think it's premature. And I can assure this Court I will make no reference to the O.J. Simpson case at any time during the course of the taking of any evidence in this case.
Defense Attorney:
That's-Judge, evidence is not what I'm worried about. I'm certain he's not going to ask any witnesses, "don't you think this is a whole lot like the O.J. Simpson case?" I'm concerned about Mr. Williams' famous arguments.
. . . .
Defense Attorney:
And I would ask that the court issue a ruling that Mr. Williams is not to refer *507 to this or to make comparisons in any way with the O.J. Simpson case and that he be held in contempt if he does that.
Prosecutor:
Judge, I ask the court to allow me, as an officer of this Court, to conduct this case in the proper manner, but in the way that I see fit. And, I have given the Court my word that I will not, at any time during the course of the taking of evidence or before the jury in this case, mention the O.J. Simpson case. . . . So, I have-I give the Court my word that I won't do this. I just ask you not to grant this motion.
. . . .
The Court:
Based on Mr. Williams' representations, I'm going to deny your motion.
The defense argues that the prosecutor's comments on the O.J. Simpson verdict to this all white jury were devastating and requires that the conviction be reversed. While there is much evidence that the majority of white Americans believed O.J. Simpson was guilty of murdering his wife and that he "got away with it," the prosecutor's improper comments during the penalty phase do not implicate the trial phase.
The defendant's own confession, plus the testimony of his ex-wife, Mary Snyder who survived this brutal attack, along with that of Gwen Williams, the witness who came to the aid of Ms. Snyder during the attack, support the defendant's conviction of first degree murder. The prosecutor's improper and clearly inflammatory comments did, however, create a substantial risk that the death penalty would be imposed. In my opinion, the defendant's death sentence should be set aside and this matter remanded for re-sentencing.
The United States Supreme Court granted defendant's writ of habeas corpus, vacated the judgment of this court and remanded the case to the Court to reconsider defendant's Batson claims in light of its recent opinion in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). In Miller-El, the Supreme Court reaffirmed its position that racial discrimination by any state in jury selection offends the Equal Protection Clause of the 14th Amendment to the United States Constitution. This rule is meant to ferret out discrimination from our judicial system.
In this case, the majority's opinion concludes that although the prosecution is required by Batson to give race neutral reasons for a peremptory challenge, the race neutral reasons need not be persuasive or even plausible. The trial court need only find the prosecution's race neutral explanations to be credible. They conclude that the burden of proof never shifts from the defendant who must prove the State's discriminatory intent.
The difficulty for trial courts has always been separating out reasons that are legitimate, from those that are merely pre-textual. Miller-El suggests some tools to use in determining whether the proffered race neutral reasons are pre-textual. First, we should look at the number. In Miller-El, out of twenty(20) black members included in the one-hundred and eight (108) person venire panel, only one (1)actually served as a juror. Here, nine (9) of the eighty-five (85) prospective jurors were black. Four(4) were dismissed for cause and five(5) were removed by the State with peremptory challenges. One of the two alternate jurors was black, but she did not participate in the jury's deliberations.
Secondly, Miller-El suggests we must do a side-by-side comparison of the black jurors who were struck and the white jurors *508 who were allowed to serve. Any patterns of disparate treatment or questioning with regard to the death penalty should lead to the conclusion that the questioning was intended to exclude black venire members, despite any race neutral reasons proffered to the contrary. The trial court's job is to determine whether the reasons are credible, or even plausible.
Next, Miller-El suggests that we go beyond the comparisons to look at broader patterns of discriminatory practices during the jury selection process. In Miller-El, the Court concluded that the first clue to the prosecutor's discriminatory intent could be found in their resort during voir dire to a procedure known in Texas as the "jury shuffle." The record showed that the Dallas County District Attorney's Office used the jury shuffle to manipulate the racial composition of the jury and avoid reaching prospective black panel members.
Louisiana does not have the "jury shuffle," but we do have a practice that can be used in an equally discriminatory fashion. Louisiana allows parties to use peremptory challenges to "back strike" jurors pursuant to LSA-C.Cr.P. art 795.[1]
In State v. Plaisance, 00-1858 (La. App. 4Cir. 3/6/02), 811 So.2d 1172, rehearing denied, the Fourth Circuit concluded that the trial court's error in not allowing back strikes and the method employed in exercising challenges was harmless; the guilty verdict rendered was unattributable to the errors. In State v. Watts, 579 So.2d 931 (La.1991), the Court granted a writ of certiorari with an order stating: "A juror temporarily accepted and sworn in accordance with LSA-C.Cr.P. Art. 788 may nevertheless be challenged peremptorily prior to the swearing of the jury panel in accordance with LSA-C.Cr.P. Art. 790. LSA-C.Cr.P. Art. 795(B)(1)." See also State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 376 ("peremptory challenges are exercisable at any time before the jury panel is sworn,") citing LSA-C.Cr.P. arts. 788, 790, 795(B)(1).
In this case, the State used its seventh peremptory challenge to back strike Jeffery Brooks, who had initially been accepted in the first panel of prospective jurors called for examination. Upon the defense's Batson's challenge to the State's later backstrike of Mr. Brooks, the State responded that Mr. Brooks was very uncertain, and "looked nervous to me throughout the questioning," and that Mr. Brooks's concern about missing class as a student teacher might lead him "to go home quickly, come back with guilty of a lesser verdict so there would not be a penalty phase." The trial court allowed the peremptory challenges without a ruling as to whether the State's explanation was race-neutral or credible.
The Batson violations herein resulted in the defendant being denied his right to be tried by a jury of his peers. In Snyder I, I was of the opinion that these Batson violations required a setting aside of the death penalty, but not the conviction(guilt phase), since the evidence seemed to be persuasive. Now, I am of the opinion that these flagrant Batson violations require that the defendant's conviction and sentence must be set aside, and the case remanded for a new trial. The defendant in a capital case is entitled under the Sixth and Fourteenth Amendments to an impartial jury in both the guilt and the penalty phase. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 191 L.Ed.2d 492(1992).
*509 For the aforementioned reasons, I respectfully, dissent.
NOTES
[*] Retired Judge Fred C. Sexton, assigned as Associate Justice Ad Hoc., sitting for Associate Justice Jeannette T. Knoll, recused.
[1] The specific facts of the crime for which defendant was convicted are discussed in State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832 (Snyder I).
[2] The jury specifically found that defendant "knowingly created a risk of death or great bodily harm to more than one person." Snyder, 98-1078 at 3 n. 2. 750 So.2d at 837 n. 2. Snyder's estranged wife, Mary, was in a vehicle with Howard Wilson when defendant attacked both. Wilson died at the hospital, but Mary survived the attack and testified at trial. Id., 98-1078 at 3, 750 So.2d at 836.
[3] This was the second Miller-El opinion rendered by the Supreme Court. In the first, Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), the Court did not address the merits of petitioner's claim to federal habeas relief from a state court conviction for capital murder. The procedural posture of the case at that time was that the federal District Court had denied the petition and the federal Court of Appeals had denied a certificate of appealability (COA). The Supreme Court granted certiorari and reversed, finding that a COA should have issued. The Court found the District Court did not give full consideration to the substantial evidence petitioner put forth in support of a prima facie case; instead, it accepted without question the state court's evaluation of the demeanor of the prosecutors and jurors in petitioner's trial.
[4] The defendant's habeas petition sought review pursuant to 28 U.S.C.A. § 2254, which was explained by the Court as follows:

Where 28 U.S.C. § 2254 applies, [the Court's] habeas jurisprudence embodies [significant] deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).
Miller-El, 537 U.S. at 340, 123 S.Ct. at 1041.
[5] The concern expressed by the majority of the Supreme Court in Swain, 380 U.S. at 219, 85 S.Ct. at 825, for accommodating the prosecutor's historical privilege of peremptory challenge was eroding as early as Batson, 476 U.S. at 102-103, 106 S.Ct. at 1726, when Justice Marshall, concurring with the majority stated: "The decision today will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely." Currently, in Miller-El, 545 U.S. at 269-74, 125 S.Ct. at 2342-2344, Justice Breyer, in a concurrence, noted that peremptory challenges are increasingly anomalous in our judicial system. He wrote, "If used to express stereotypical judgments about race, gender, religion or national origin, peremptory challenges betray the jury's democratic origins and undermine its representative function." Justice Breyer concluded that Miller-El illustrated the necessity of reconsideration of the Batson test and the peremptory challenge system as a whole. Id.
[6] We note the standard of review in a federal habeas case is different from that on direct appeal. In the context of a direct review of a Batson issue, the trial court's decision on the ultimate question of discriminatory intent by the State is a finding of fact accorded great deference, which finding will not be overturned unless clearly erroneous. Miller-El, 537 U.S. at 340, 123 S.Ct. at 1041. "Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." Id., 537 U.S. at 339, 123 S.Ct. at 1041.
[7] The Court had previously noted that the defendant had been indicted for capital murder in Texas. Miller-El, 537 U.S. at 328, 123 S.Ct. at 1035. He pled not guilty and jury selection took place during five weeks in February and March of 1986. When voir dire concluded, defendant moved to strike the jury on grounds that the prosecution had violated the Equal Protection Clause of the Fourteenth Amendment by excluding African-Americans through the use of peremptory challenges. Defendant's trial occurred prior to the Court's decision in Batson, while Swain was controlling precedent. As that case required, defendant sought to show that the prosecution's conduct was part of a larger pattern of discrimination aimed at excluding African-Americans from jury service. In a pretrial hearing, defendant presented extensive evidence in support of his motion. Id.

The Texas district court denied the motion to strike the jury, and 12 days later the jury found defendant guilty. The trial court sentenced him to death. Id.
Defendant appealed to the Texas Court of Criminal Appeals. While that appeal was pending, on April 30, 1986, the Supreme Court decided Batson. The Texas Court of Criminal Appeals remanded the case for new findings in light of Batson, and a post-trial hearing was held in 1988, two years after the allegedly discriminatory voir dire. Id., 537 U.S. at 328-329, 123 S.Ct. at 1035.
[8] One of the arguments defendant's appellate counsel makes would take us outside the four corners of the appellate record for so-called proof "that race discrimination is routine in Jefferson Parish." We decline to address this "historic discrimination" issue as the details of counsel's argument are not evidence. We do not view Miller-El, a habeas proceeding in federal court, as license to consider matters that are dehors the record which is before us on direct appeal.
[9] This requirement is arguably at odds with the Louisiana statutory provision that provides "the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror." (Emphasis supplied.) LSA-C.Cr.P. art. 795(C). In the instant case, the prosecutor volunteered race neutral reasons each time defense counsel made a Batson objection. Thus, it is unnecessary for us to address reconciliation of the Louisiana provision with the mandate of Miller-El. We do observe, however, that the Louisiana statute's grant to the trial court of broad discretion in ruling on a Batson objection in light of apparent reasons from the voir dire may have been interpreted by the trial court as alleviating any necessity for explanation by the court of its reasons for allowing the State's peremptory challenges.
[10] Jury shuffling was explained in Miller-El. Texas law permits either side in a criminal case to shuffle the cards bearing panel member names to rearrange the order in which they are questioned. Members seated in the back may escape voir dire, for those not questioned by the end of each week are dismissed. The Court noted the prosecution had shuffled the cards when a predominate number of African-Americans were seated at the front of the panel. Miller-El, 545 U.S. at 252-55, 125 S.Ct. at 2332-2333.
[11] As noted in defendant's brief on remand, the only African-American venire person not stricken by the State, Jacqueline Woods, was in the seventh panel, which was questioned to seat two alternate jurors after the twelve-member jury had already been selected. None of the alternates sat. We agree with defendant's appellate counsel that the selection of Woods does not defeat defendant's Batson claim. See State v. Harris, 01-0408 (La.6/21/02), 820 So.2d 471 (Batson error required new trial, despite presence of one African-American on the jury.)
[12] Walker stated initially that she could not consider the death penalty under any circumstances. Upon further questioning, Walker conceded that she could consider capital punishment in the case of the murder of a child. As the prosecutor informed the trial court, this case did not involve the killing of a child, and he therefore excluded Walker peremptorily on the basis of her general opposition to the death penalty.
[13] Because the State had accepted Jeffrey Brooks in the first panel of prospective jurors, the strikes exercised against Greg Scott in the second panel and Hawkins in the third panel did not reveal any pattern of exclusions which might have supported an objection on Batson grounds. However, the care with which defense counsel noted the race of the jurors for the record placed both the State and the trial judge on notice that a Batson challenge might be forthcoming. Defense counsel then made the challenge during the examination of the third panel of prospective jurors and at that point could have argued that the State should also have to defend its strikes against Scott and Hawkins because they formed part of a pattern that became apparent with the later strike of Elaine Scott. However, counsel did not argue for the inclusion of Greg Scott and Hawkins in his Batson challenge, thereby prompting this court's procedural default on appeal of this aspect of the State's jury selection.

This court further found that counsel's failure to expand the basis of the Batson objection did not constitute ineffective assistance because the State's exclusion of Scott and Hawkins did not directly and fundamentally impact the integrity of the fact-finding process at trial. Snyder, 98-1078 at 11-12, 750 So.2d at 842, citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[14] Before the court allowed the State's exercise of a peremptory challenge of Brooks, the State explained further: "If this case goes to the jury on Friday and one of them gets back there and gets smart and thinks that if they come back [with] guilty of second degree murder, they won't have to do a penalty phase. I guarantee that's a very real concern."
[15] Defendant's current counsel was not involved in his representation at any stage of the trial or direct appeal. The Capital Appeals Project undertook representation following the denial of rehearing by this court on June 25, 2004, and prepared and filed the Petition for Writ of Certiorari to the Supreme Court of the United States.
[16] Defense counsel also argues the State's challenge of Brooks was inconsistent with the prosecutor's failure to question McMurray about her concerns over a court-reporting course at Franklin College that she was just starting. Although McMurray approached the bench during the pre-voir dire process, her chief articulated concern was someone to take care of her two-and-a-half year old daughter. The court did not excuse her prior to the questioning of the second half of the second panel of jurors. During the prosecutor's questioning of the panel about the insanity defense, McMurray's responses indicated such a strong reservation concerning that defense that the responses obviated the need for questioning her about her ability to concentrate despite her personal problems. Subsequently, there was a predictable defense challenge for cause of this prospective juror that was granted by the court.
[17] By the time the fifth panel was called, the State had already backstruck Brooks.
[18] This proceeding was a Prieur hearing at which defense counsel attempted to have the evidence excluded as being irrelevant. At the hearing, the State identified the five incidents that had been included in the Prieur notice: 1) In May of 1995, Snyder beat his wife with a baseball bat. 2) On March 11, at a club in Kenner, Snyder hit his wife's head into the window of his truck. 3) On June 11, 1995, Snyder pushed his wife's head through the sheetrock wall of their bedroom. 4) On June 18, 1995, at the home of the parents of Mary Snyder, Snyder accosted his wife as she slept, put his hand over her mouth, and stabbed her several times with a screwdriver. 5) On another occasion, in a telephone call, Snyder threatened his wife with more bodily harm. In context, the State's reference to the O.J. Simpson case was an illustration to the court of the relevance of such incidents. The trial court ruled evidence of all five of the incidents would be admissible at defendant's trial.
[19] In its motion, defense counsel stated:

Surveys conducted since the verdicts in the O.J. Simpson trial have shown consistently that a large majority of white Americans believe the not guilty verdicts were wrong; many indicate that the verdicts have undermined their faith in the entire jury system. To play upon these fears and prejudices to what will doubtless be an overwhelminglyif not allwhite jury deciding the case with admitted similarities is an appeal to racism at worst and vigilante justice at best, and as such is specifically precluded by Louisiana law.
Despite the allegations of the defense motion, neither side introduced evidence at the hearing on the motion. Thus, the trial court's denial was based solely on the argument of counsel.
[1] Back striking refers to a party's exercise of a peremptory challenge to strike or excuse a prospective juror after initially accepting him, but prior to the final swearing of the jury panel.