# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 11-1395

**STATE OF LOUISIANA**

**VERSUS**

**ROBERT WILKINS**

\*\*\*\*\*\*\*\*\*\*
**APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 19337-04
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE**
\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, J. David Painter, and James T. Genovese, Judges.

**CONVICTIONS REVERSED; SENTENCES VACATED; REMANDED FOR NEW TRIAL.**

Richard Bourke
Ada Phleger
Louisiana Capital Assistance Center
636 Baronne Street
New Orleans, LA 70113
(504) 558-9867
**ATTORNEY FOR DEFENDANT/APPELLANT:**
Robert Wilkins

John F. DeRosier, District Attorney
Cynthia S. Killingsworth, Karen C. McClellan, Carla S. Sigler
Assistant District Attorneys
901 Lakeshore Drive, Suite 600
Lake Charles, LA 70601
(337) 437-3400
**ATTORNEYS FOR STATE OF LOUISIANA/APPELLEE**

**Cooks, Judge.**
## FACTS AND PROCEDURAL HISTORY

Robert Daniel Wilkins (Defendant) killed Anthony Fontenot (Fontenot) on September 21, 2004. According to evidence presented and proffered at trial, Defendant and Fontenot formed a relationship as drug user and drug supplier from January 2004, to September 2004. Defendant allegedly began the relationship as a drug user supplied by Fontenot but gradually became a drug distributor for Fontenot in order to fund his addiction. Defendant accumulated a monetary debt of approximately $5,000.00 owing to Fontenot for illicit drugs. Fontenot allegedly repeatedly warned Defendant that if he did not pay his debt Fontenot would kill him. On September 21, 2004, the two men met at a deserted boat dock after dark. Defendant cut Fontenot with a knife once in the arm and then stabbed him in the neck. He fled the scene, leaving Fontenot behind. Fontenot bled to death as a result of the stab wound to his neck. Defendant asserted he acted in self-defense and feared Fontenot because of his reputation for violence and carrying a weapon, along with the numerous death threats he allegedly made to Defendant. No evidence was presented to establish that Fontenot initiated any threatening act toward Defendant on the night of the stabbing. When Defendant learned later that evening that Fontenot was found dead and that police were gathered at Defendant's grandmother's house where he also resided, he voluntarily turned himself in to the police and explained his version of the events.

Defendant was charged in an indictment filed on November 18, 2004, with first degree murder, a violation of La.R.S. 14:30; possession of cocaine with intent to distribute, a violation of La.R.S. 40:967; and possession of marijuana with intent to distribute, a violation of La.R.S. 40:966. Defendant entered pleas of not guilty

on December 13, 2004.  On December 5, 2005, the State announced its intent to seek the death penalty.

The indictment was amended on May 16, 2007, to reflect the charge as second degree murder, a violation of La.R.S. 14:30.1. At that time, Defendant entered a plea of not guilty.  On June 24, 2008, Defendant waived his right to trial by jury.  On January 3, 2011, Defendant chose to proceed with a jury trial.  Jury selection subsequently commenced.  On January 6, 2011, the jury returned verdicts of guilty on all charges.

A Motion for New Trial was filed on February 23, 2011.  On the same date, the Motion for New Trial was denied. Defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence for second degree murder; fifteen years at hard labor with the first two years to be served without benefit of probation, parole, or suspension of sentence for possession of cocaine with intent to distribute; and to fifteen years at hard labor for possession of marijuana with intent to distribute.  The sentence for possession of cocaine with intent to distribute was to run concurrently with that for possession of marijuana with intent to distribute, and the sentence for possession of marijuana with intent to distribute was to run consecutively to the sentence for second degree murder. A Motion to Reconsider Sentence was filed on March 28, 2011, and was denied.

A Motion for Appeal was filed on March 28, 2011, and was subsequently granted.  Defendant is now before this court asserting fifteen assignments of error maintaining that: (1) his state and federal constitutional rights were violated when he was tried by a jury from which the State had struck three venire members because they were African American; (2) the trial court erred in denying the defense's *Batson* challenge as to juror Mitchell on the basis of the court's colloquy

2

with the juror after the State had made its motion to strike; (3) the district court erred in denying the defense's *Batson* challenges as to jurors Wiley and Duhon on the basis that the defense had failed to ask that the jurors be kept when struck from service the day before the *Batson* challenge was made; (4) his state and federal constitutional rights to due process and to have the State prove its case beyond a reasonable doubt were violated when the district court failed to properly charge the jury on the law applicable to the responsive verdict of manslaughter; (5) his state and federal constitutional rights to Equal Protection were denied when he was convicted by a non-unanimous jury whose verdict was authorized by a statutory scheme introduced to disenfranchise black jurors; (6) his Sixth and Fourteenth Amendment rights to trial by jury were denied when he was convicted by a non-unanimous jury; (7) his state and federal constitutional rights to due process, to a fair trial, to confront witnesses, to compulsory process, to trial by a jury, and to present a defense were violated when he was prevented from presenting his defense by Louisiana's unconstitutional "hostile demonstration and overt act" requirement; (8) his state and federal constitutional rights to due process, to a fair trial, to confront witnesses, to compulsory process, to trial by a jury, and to present a defense were violated when the trial court erroneously found that he had not satisfied Louisiana's "hostile demonstration or overt act" requirement; (9) his state and federal constitutional rights to due process, to a fair trial, to confront witnesses, to compulsory process, to trial by a jury, and to present a defense were violated when he was prevented from presenting evidence of the victim's lethal aptitude with the knife with which he was armed; (10) his state and federal rights to due process were violated when Judge Wyatt recused Judge Carter based upon a ground of recusal not previously alleged and upon evidence not contained in the record; (11) Judge Wyatt erred when he ruled that the *Caperton* standard applied to

a state recusal motion in Louisiana; (12) Judge Wyatt erred when he recused Judge Carter, rather than the local prosecutor's office, in the face of untenable discord sponsored by the prosecutor's office; (13) "Judge Wyatt erred when he applied a different standard to the recusal of Judge Carter from a judge trial, as opposed to a jury trial"; (14) his state and federal constitutional rights to due process were violated when Judge Carter was recused based on the false and misleading premise that Assistant District Attorneys Killingsworth and Sigler would try the case; and (15) his state and federal constitutional rights to a speedy trial were violated.

We will address the assignments of error regarding Defendant's well-founded *Batson* objection, as well as the motion for speedy trial. Because our decision reverses Defendant's convictions and vacates his sentences, it is not necessary to address the remainder of Defendant's assignments of error.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent concerning Defendant's sentence for second degree murder; however, the error is rendered moot by our finding that Defendant's convictions must be reversed, his sentences must be vacated, and the matter remanded to the trial court for a new trial.

**ASSIGNMENT OF ERROR NO. 15.**

In his fifteenth assignment of error, Defendant contends his state and federal rights to a speedy trial were violated by the six years he spent in jail awaiting trial. We address this assignment of error first, as the remedy for a violation of the constitutional right to speedy trial is dismissal of the indictment. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, (1972); *State v. Alfred*, 337 So.2d 1049 (La.1976).

4

The constitutional right to a speedy trial is imposed upon the states by the Due Process Clause of the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967). The underlying purpose of this constitutional right is to protect a defendant's interest in preventing pretrial incarceration, limiting possible impairment of his defense, and minimizing his anxiety and concern. *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972). The Supreme Court has set forth the following four factors for courts to consider in determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of his right to speedy trial; and (4) the prejudice to the accused resulting from the delay. *Id.* at 531-532, 92 S.Ct. at 2192-93; *see also State v. Reaves*, 376 So.2d 136 (La.1979) (adopting *Barker* factors). The specific circumstances of a case will determine the weight to be ascribed to the length of and reason for the delay because "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Reaves*, 376 So.2d at 138 (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192).

*State v. Batiste*, 05-1571, pp. 6-7 (La. 10/17/06), 939 So.2d 1245, 1250.

Defendant contends the 2,294 days he spent in jail awaiting trial cannot be attributed to him in any meaningful measure and represents an unusual and unconstitutional delay in the proceedings. He asserts the length of the delay merits inquiry into the reasons for the delay. He further asserts he had motions pending before the trial court for 204 days of the 2,294 days he spent in jail before trial. Additionally, he asserts, with the exception of a seven-day period from May 3, 2010, to May 10, 2010, he neither requested nor assented to any stay of the proceedings to allow for supervisory review of proceedings.

Defendant contends he asserted his right to speedy trial, and he suffered personal and legal prejudice as a result of the delay in bringing him to trial. He asserts that in addition to the time he spent in custody, he was prejudiced by the loss of critical evidence and witnesses, including the death of his grandmother with whom he lived at the time of the offense. Defendant maintains that because, after his arrest, he was denied conflict-free counsel for over a year and lost the

opportunity to gather contemporaneous evidence to corroborate his statement to police. He does not explain in what regard his first and second appointed counsel, who were determined to have conflicts barring their representation of him, resulted in prejudice to his defense.

The first factor considered in a constitutional speedy trial analysis is the length of the delay. Defendant was indicted on November 18, 2004, and trial by jury commenced on January 3, 2011, constituting a delay of just over six years. In *Barker*, 407 U.S. 514, the Supreme Court found that a delay of more than five years between the defendant's arrest and trial was extraordinary. This court has previously held a three-year delay between arrest and the time of trial was presumptively prejudicial. *State v. Ellis*, 94-1106 (La.App. 3 Cir. 3/1/95), 651 So.2d 949. Consequently, we find the delay in the case at bar is presumptively prejudicial, triggering the necessity for further inquiry into the *Barker* factors.

The second factor considered in a constitutional speedy trial analysis is the reason for the delay. Defendant was indicted on November 18, 2004. Counsel was immediately appointed to represent Defendant. This appointed indigent defense counsel was later replaced by the appointment of another attorney due to a conflict of interest. Defendant was represented by counsel from the beginning of the process; however, he was not represented by conflict-free counsel until the Louisiana Capital Assistance Center was appointed to represent him on December 5, 2005, replacing the second attorney appointed to represent him.

Defendant requested or consented to four continuances of his trial. The matter was re-fixed when Defendant's Motion to Recuse Judge Ritchie was granted, and the case was re-allotted to Judge Carter. The matter was re-fixed when Defendant waived his right to trial by jury.

6

Defendant filed sixteen motions on April 25, 2006, and fifteen motions on March 6, 2008. When Defendant filed a Motion for Speedy Trial on March 24, 2008, at least fifteen of his motions were pending. After the trial court ruled on the bulk of Defendant's motions, the State filed ten notices of intent to seek review of the trial court's rulings. Defendant also sought review of several of those rulings.

The State filed a motion to recuse Judge Carter on July 21, 2008, and that issue was not finally resolved until December 30, 2010. That motion was eventually found to have merit, and the case was re-allotted to Judge Savoie.

In *State v. Cyrex*, 97-2520 (La.App. 1 Cir. 9/25/98), 746 So.2d 1, *writ denied*, 98-2692 (La. 1/29/99), 736 So.2d 829, there were almost forty-seven months between the defendant's arrest and the first circuit's granting of the State's writ application. The first circuit noted that a majority of the almost forty-seven month period was spent litigating the defendant's pre-trial motions. Approximately one year of that period of time was consumed by the State seeking and obtaining review by the first circuit of the three district court interlocutory rulings, with the State successfully having an erroneous ruling reversed by the first circuit in each instance.

> Under *Barker*, delays in bringing the case to trial caused by the state's applications for supervisory review of interlocutory rulings may be weighed in determining whether or not a defendant has suffered a violation of his right to a speedy trial. *See United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986). It is clear in this case, however, that defendant has failed to show a reason for according these delays any effective weight towards the denial of his speedy trial claim. There is no showing of bad faith or dilatory purpose on the part of the state as to the writ applications. The state's position in each of the three referenced writ applications was correct, and our decisions granting reversals in the applications are prima facie evidence of the reasonableness of the state's action. *See United States v. Loud Hawk*, 474 U.S. at 316, 106 S.Ct. at 656. It is unfair for the defense to complain that the right to a speedy trial was violated when substantial time was consumed having erroneous trial court rulings reviewed.

*Id.* at 5-6 (footnote omitted).

The third factor to be considered in a constitutional speedy trial analysis is the accused's assertion of his right to a speedy trial. Defendant filed a *pro se* Motion for Speedy Trial on April 15, 2005. Therein, he asserted his constitutional right to a speedy trial and asked that his motion be granted in accordance with the guidelines set forth in La.Code Crim.P. art. 701 or that he be released from custody or bond obligations. The trial court issued a ten-day order on April 20, 2005.

Defendant again filed a Motion for Speedy Trial on March 24, 2008. Therein, he again asserted his constitutional right to speedy trial. The motion was granted. The State sought supervisory review of the trial court's ruling. In *State v. Wilkins*, an unpublished writ ruling bearing docket number 08-503 (La.App. 3 Cir. 5/16/08), *writ denied*, 08-1310 (La. 7/15/08), 986 So.2d 67, this court found there was no error in the trial court's ruling.

On April 15, 2009, Defendant filed a Motion to Lift Stay and for Relief Under La. C.Cr.P.Art. 701. Therein, Defendant sought release from custody pending trial. That motion was randomly allotted for hearing.

On March 10, 2010, the Defendant filed a *pro se* Motion for Relief Under LA.C.Cr.Art. 701. Defendant sought release pending trial "pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, §16 of the Louisiana Constitution and La.C.Cr.P.art. 701(D)(2)." The matter was set for hearing. On May 10, 2010, Judge Wyatt found he had no authority to hear the motion.

On October 15, 2010, Defendant filed a Motion for Relief Under La.C.Cr.P. Art. 701. Defendant moved for release pending trial "pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, §16 of the Louisiana Constitution and La.C.Cr.P.art. 701(D)(2)." He also filed a motion to

have the case set for trial. On November 9, 2010, the trial court took the motion for 701 relief under advisement, and trial was set for January 3, 2011.

The fourth factor to be considered in a constitutional speedy trial analysis is whether the defendant has been prejudiced. In brief to this court, Defendant asserts he was prejudiced by the time he spent in custody; the loss of critical evidence and witnesses, including the death of his grandmother with whom he lived at the time of the offense; and the opportunity to gather contemporaneous evidence to corroborate his statement to the police. Defendant does not relate the witnesses' anticipated testimonies in brief to this court nor does he offer any explanation of how such testimony would have affected the outcome of the trial. In *State v. Cole*, 384 So.2d 374 (La.1980), *cert. denied*, 449 U.S. 1076, 101 S.Ct. 855 (1981), the supreme court found serious prejudice was not shown where there was no evidence of what the witness would have said or that it would have been beneficial to the defense.

In *Alfred*, 337 So.2d at 1057, the supreme court discussed the remedy for a speedy trial violation as follows:

> The amorphous quality of the right to a speedy trial leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because, unlike the exclusionary rule or the reversal for a new trial, it means that a defendant who may be guilty of a serious crime, or two as in this case, will go free without having been tried. Overzealous application of this remedy would infringe 'the societal interest in trying people accused of crime, rather than granting them immunization because of legal error . . . .' *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), White, J. Barring extraordinary circumstances, courts should be reluctant indeed to rule that a defendant has been denied a speedy trial. In none of this Court's decisions since *Barker v. Wingo* has a defendant been released for this reason.

The proper method for raising a claim of the denial of the constitutional right to a speedy trial is by motion to quash. *See State v. Gordon*, 04-633, (La.App. 1

Cir. 10/29/04), 896 So.2d 1053, *writ denied*, 04-3144 (La. 4/1/05), 897 So.2d 600; *State v. Stewart*, 07-850, (La.App. 4 Cir. 4/9/08), 983 So.2d 166. *See also State v. Reaves*, 376 So.2d 136 (La.1979); *State v. Davis*, 95-1455 (La.App. 3 Cir. 5/8/96), 677 So.2d 511, *writ denied*, 96-1215 (La. 11/1/96), 681 So.2d 1257. Defendant did not file a motion to quash nor did he ask the trial court in his various pleadings to quash the indictment. Notably, he does not ask this court to do so either.

Balancing all of the *Barker* factors, we find this assignment of error lacks merit. The total delay in the case was long, but the great majority of it was due to the legitimate course of Defendant's case which included numerous filings by both Defendant and the State. Furthermore, Defendant has not shown specific prejudice to his case. The one year delay in appointing conflict-free counsel to represent Defendant causes us concern; however, Defendant fails to make any showing of how this delay prejudiced his defense, particularly in light of the fact that he did have appointed counsel from the beginning of the prosecution of his case.

**ASSIGNMENTS OF ERROR NOS. 1, 2, & 3:**

In his first assignment of error, Defendant contends his state and federal constitutional rights were violated when he was tried by a jury from which the State struck three venire members because they were African-American. In his second assignment of error, Defendant contends the trial court erred in denying his *Batson* challenge as to juror Geraldine Mitchell on the basis of the court's colloquy with the juror after the State made its strike. In his third assignment of error, Defendant contends the trial court erred in denying his *Batson* challenges as to jurors Richard Wiley and Felicia Duhon on the basis that the defense failed to ask that the jurors be kept when struck from service the day before the *Batson* challenge was made. As Defendant addressed these three assignments collectively in brief to this court we will address them likewise.

10

In *State v. Sarpy*, 10-700, pp. 13-15 (La.App. 3 Cir. 12/8/10), 52 So.3d 1032, 1041-43, *writ denied*, 11-46 (La. 6/3/11), 63 So.3d 1006, this court discussed *Batson* challenges as follows:

> In *Batson* [*v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986)], the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. The Supreme Court reaffirmed its position that racial discrimination by any state in jury selection offends the Equal Protection clause of the 14th Amendment in *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Louisiana law codifies the *Batson* ruling in LSA-C.Cr.P. art. 795.[6] *See also State v. Snyder*, 1998-1078 (La.9/6/06), 942 So.2d 484, rev'd on other grounds, *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

> _____

> [6] LSA-C.Cr.P. art. 795(C): No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

> If the defendant makes a *prima facie* showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. If the race-neutral explanation is tendered, the trial court must decide, in step three of the *Batson* analysis, whether the defendant has proven purposeful discrimination. The race-neutral explanation need not be persuasive or even plausible. *Rice v. Collins*, 546 U.S. 333, 126 S.Ct. 969, 973-974, 163 L.Ed.2d 824 (2006), quoting *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge. *State v. Tyler*, 97-

11

0338, at 3 (La.9/9/98), 723 So.2d 939, 942, *cert. denied*, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999).

The trial court's findings with regard to a *Batson* challenge are entitled to great deference on appeal. *Id.* at 4, 723 So.2d 939; see also, *State v. Juniors*, 03-2425, p. 28 (La.6/29/05), 915 So.2d 291, 316. When a defendant voices a *Batson* objection to the State's exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor's race-neutral explanations to be credible. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 537 U.S. at 339, 123 S.Ct. at 1040.

The three-step *Batson* process which guides the courts' examination of peremptory challenges for constitutional infirmities has recently been described again by the Supreme Court as follows:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]
>
> *Collins*, 546 U.S. at 338, 126 S.Ct. at 973-74.

*State v. Anderson*, 06-2987, pp. 41-43 (La.9/9/08), 996 So.2d 973, 1004-05, *cert. denied*, __ U.S. __, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009).

During the first day of jury selection, January 3, 2011, the State exercised peremptory challenges against two African-Americans, Richard Wiley and Felicia Duhon. During the second day of jury selection, the State attempted to strike prospective jurors Nancy Ryan and Geraldine Mitchell, who were also African-Americans. Defense counsel objected, alleging the State struck every African-American juror tendered to it on the basis of race. The trial judge noted the State had challenged the four African-Americans tendered to the State and asked the State its reason for striking juror Mitchell. The State asserted Mitchell said she had back problems and may have to stand throughout the entire trial, and that her nephew had been accused of a crime. The trial judge stated Mitchell was very candid and said her nephew was treated fairly and "that's not going to do anything to harm her as a juror." The trial court would not "recognize that as a race-neutral reason as being a valid reason." The State went on to state that Mitchell had a back problem. The trial court stated it had made arrangements to deal with that issue as well.

The following exchange between the State and the trial court then took place:

**MR. CLAYTON:**

> I have one last point, if I can.
>
> . . . .

**MR. CLAYTON:**

> I have one I am uncomfortable putting on the record, but I will put it on the record.

**THE COURT:**

Well, if you want to give me a reason why -- that I am going to recognize as to why I should let you challenge this juror, you better do it.

**MR. CLAYTON:**

Okay. I'm sorry, Your Honor.

There is a police report that involves Mr. Wilkins, in which Mr. Wilkins, if this Court allows in the overt act, that in that report that they plan to put forth as his bad acts, he referred to a potential victim as a N-loving queer. There's another statement that emanates from them in where -- saying that the victim made those statements. But the defense is purporting to put forth the KKK, that the victim was a member of the KKK.

**And the fact that Ms. Mitchell is an African-American, I didn't want to run the risk of putting her on this jury -- and it applies to the rest of them also – if this Court would allow in KKK issues about my victim, whether or not they would be – would hold that against my victim, being a member of it.**

I understand the Court's perspective; but I thought it was in the mind of me, as a prosecutor on this case. And I am uncomfortable with it. I'm very – **I'm uncomfortable with somebody being KKK around me, and I would suspect that she would be also**. And I just don't want my case being tried on letting him go because the victim -- I mean, the jurors may say, man, he was a member of the KKK.

I don't know what may or may not come in. And that's an issue with me. **And it is an underlying issue I have with the other three African-Americans**.

**THE COURT:**

I guess my concern is how can I judge that because I heard no questions about that. Am I supposed to assume a bias because you have one?

**MR. CLAYTON:**

Your Honor, because, I mean, I think you put a [sic] unwritten rule of sorts because when you didn't -- we don't know whether or not this overt act is going to come in.

And I heard from you -- and correct me if I'm wrong -- about this issue of the KKK, that it may be -- if the opportunity presents itself you may let it in.

I'm not -- I wasn't going to stand before this jury and start talking about my guy being a potential member of the KKK. I just wasn't going to do it unless I got emphatically from you that you were going to let it in. Then I would voir dire on it.

I don't think you are going to let it in. But that underlying word "think," I don't know. And I am not – **I am just not comfortable putting a bunch of African-Americans on the jury where the defense -- and what's the reason for them going to bring up something about KKK or that N-loving word?** What's the probative value of that in this trial, other than to inflame a jury? **And I think blacks would be a little bit more inflamed by that word than others.**

(Emphasis added).

Mitchell was informed there may be evidence the victim was a member of the KKK and that he used racial slurs. Mitchell stated she would find those things offensive and could not say that she would be able to put that aside. She further indicated she would not "be comfortable in that kind of setting or with that kind of language" and then stated she thought it would be disturbing to her feelings, and it would offend her.

Ryan was also questioned regarding the victim's possible membership in the KKK and his use of racial slurs. Ryan indicated she would be offended by "the word." She stated it bothered her if "you direct it to me or if you disrespect me in my presence by using that." She also stated she did not know "this man" and could not say it would bother her. She further stated it would bother her if she knew "he was a super active member right now, you know. But if that didn't have anything to do with what happened to him, I don't see why it would bother me."

The following exchange then ensued:

**THE COURT:**

All right. For the record, the Court will note that yesterday two other African-Americans were excused. I heard no objection to them; so, I did not ask that they be kept. . . .

. . . .

15

So, I am going to overrule the *Batson* challenge on Geraldine Mitchell – I mean, grant the *Batson* challenge on Geraldine Mitchell, overrule the challenge on Nancy Ryan --

Well, you haven't given me any other reason. Do you have any other reason on Nancy Ryan?

**MR. CLAYTON:**

Yes, Judge. Ms. Ryan spoke of two grandsons that she had -- if the Court would have allow [sic] me, I guess I could have expounded on it, but that are -- that may be part of the system now. And, here again, it may be bad on me for not embarrassing her and asking her about her grandsons' tentative charges.

**THE COURT:**

What do you mean "may be"?

**MR, CLAYTON:**

I'm saying may be – I mean, I'm putting the blame on me that maybe I should have asked her in front of everybody whether or not –

**THE COURT:**

That comment that she made about her grandsons was only in that she liked to hear both sides of the story. She didn't say that anybody was in trouble. Did she? I didn't hear her say anything like that.

**MR. CLAYTON:**

No. But -- but when I was in court one of the assistant prosecutors came to me and said I think I may know this lady; I think I may have two charges on her sons.

**THE COURT:**

I didn't hear any questions about that.

**MR. CLAYTON:**

Okay. All right. But I still stand by my premise of bumping Ms. Ryan. And I would ask for a stay to go to the Third Circuit that even her comments to you just then about this KKK deal and about the "N" word -- and I think the Court -- the "N" word was not what they said about Mr. Fontenot. The document -- and if I said it to you, then I said it to you wrong -- Mr. Fontenot purportedly told it to another person that you are an N-loving queer – F'n N-loving queer.

I stand seriously by my position about putting this lady on a jury dealing with potentially [sic] that's not even real that my victim was a KKK member and slung around the "N" word. You saw the pain that that lady went through. I don't know if you could have felt the pain. Now, she – you have that robe on. She is going to stand before you and tell you, yes, Your Honor, I can deal with it [,] and I can probably put it aside. But just as that first lady, it is a devastating, devastating word, Your Honor. And KKK is also. And to put someone on the jury, force me to put her on the jury, **I'm not putting her off this jury because I'm black -- I mean she is black. Let the record reflect that I am black too. So, it has nothing to do with that. It has a lot to do with what I think as a prosecutor what she may bring back there that may hurt my case.** It is self-serving testimony, throwing out that KKK stuff; and even his lawyer tried to get in other stuff about KKK. I don't know. **And I – believe you me, that's the word that these folks can't deal with, Your Honor. They just can't.** And I still question -- and I have a serious problem about having Ms. Ryan sit on this jury knowing what may emanate from it as well as Wylie and any other jurors. And that's my reason for doing it. Had they not brought up that KKK stuff, had they not brought up these N-words in these documents, I could care less. But the race issue came from them, not me. And I don't see no [sic] probative value whatsoever for having the N-word used in this courtroom at all.

(Emphasis added).

The trial court noted that close to fifty people were put in the jury box, and four of them were black. Further, no questions were asked of them during *voir dire* which addressed the issues being discussed. The trial court then stated:

**THE COURT:**

. . . .

And I tried to deal with it in two people that I still could. Two people are already gone. I can't deal with them.

And I am -- I am satisfied that it affected one lady. I am not satisfied that it affected another lady.

So, your feelings, without any record of what they were other than what I made, is insufficient for me for Ms. Ryan. Okay?

I am going to deny the *Batson* challenge on the other two jurors that were excused yesterday, that being –
**MR. BOURKE:**

17

No. 289, Mr. Wylie, and No. 76, Ms. Duhon, were the other two African-Americans.

. . . .

**THE COURT:**

On Geraldine Mitchell, yes, peremptory challenge is being granted.

**MR. BOURKE:**

Please note my objection.

**THE COURT:**

I am satisfied through my questioning that she would be biased or prejudiced or would have a very difficult time sitting in judgment in this case.

Ms. Ryan, on the other hand, in response to my questions, feels like she can set it aside and be a fair and impartial juror. So, I am not going to grant the peremptory challenge to Ms. Ryan.

So, that leaves us with -- 11?

And I am going to deny the other two that were gone yesterday. Procedurally, I am -- you didn't ask me. You didn't make a notation of it. You didn't say a word. So, they are gone. I'm not going to bring them back in.

Defense counsel objected to the denial of the *Batson* challenge regarding Mitchell, Wiley, and Duhon.

Defendant asserts three African-Americans were deliberately excluded from jury service because of their race; thus, his convictions were obtained in violation of the Equal Protection clause of the state and federal constitutions and must be reversed. In support of his argument, Defendant cites *State v. Harris*, 01-408 (La. 6/21/02), 820 So.2d 471.

Defendant contends the trial court erred in denying his *Batson* challenges as to Mitchell. He asserts Mitchell was struck by the State explicitly on the basis of her race; therefore, she should have been placed back on the jury or the entire jury

18

venire struck, and jury selection begun anew with a jury untainted by racial considerations. Defendant contends the trial court erred in basing its denial of the *Batson* challenge on its own efforts to confirm the truth of the State's race-based assumptions. He asserts the sole focus of the *Batson* inquiry is the intent of the State at the time the peremptory strike is exercised. In support of this argument, he cites *State v. Green*, 94-887 (La. 5/22/95), 655 So.2d 272, and *State v. Myers*, 99-1803 (La. 4/11/00), 761 So.2d 498.

Defendant further contends it has never been the case that race based peremptory challenges would only be disallowed if the assumptions and stereotypes upon which they were based were found to be completely false. In support of his contention that the State is not permitted to exercise peremptory challenges based upon assumptions derived from a juror's race, even if those assumptions carry a shred of truth, Defendant cites the following from footnote eleven of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140, 114 S.Ct. 1419, 1427 n.11 (1994):

> The Equal Protection Clause, as interpreted by decisions of this Court, acknowledges that a shred of truth may be contained in some stereotypes, but requires that state actors look beyond the surface before making judgments about people that are likely to stigmatize as well as to perpetuate historical patterns of discrimination.

As Defendant notes, none of the white prospective jurors were questioned about their attitudes toward the "N-word" or the victim's possible membership in the KKK. He further rightly contends the pattern of disparate questioning could not serve to cure the *Batson* violation, and, as the State did not offer a race neutral justification for the peremptory strike of Mitchell, the *Batson* inquiry should have ended there. Defendant contends it was not open to the trial court to receive a reason for the strike that was race neutral and then conduct its own inquiries to see

19

if the strike was justified. We find the record clearly reflects the State candidly admitted its reason for striking all of the black jurors was based on their race.

Defendant contends his *Batson* challenge as to Wiley and Duhon was timely. We agree. In support of this argument, he cites *State v. Duncan*, 99-2615 (La. 10/16/01), 802 So.2d 533, *cert. denied*, 536 U.S. 907, 122 S.Ct. 2362 (2002). He rightly contends the pattern of discrimination became clear when the State struck all available African-American jurors. There is no rule requiring a defendant to request that African-American jurors struck by the State be held by the trial court in the event a pattern of discriminatory strikes emerges and a *Batson* challenge will ultimately be made. *Batson* relief is not conditioned upon the availability of the improperly struck jurors for return to the panel. In fact, both *Batson* and La.Code Crim.P. art. 795(E) provide for the return of struck jurors as an available remedy.

Defendant also contends the trial court's reliance on the fact that Wiley and Duhon were not retained pending any subsequent challenge as a form of procedural default was in error. For the reasons stated above, we agree.

The State contends that at the time the *Batson* challenge was raised, only four of the forty-nine prospective jurors were African-American, and bare statistics do not support a *prima facie* case of discrimination. In support of this statement, the State cites *State v. Dorsey*, 10-216 (La. 9/7/11), 74 So.3d 603, *cert. denied*, __ U.S. __, 132 S.Ct. 1859 (2012).

The State contends Defendant put race at issue in the case at bar in an effort to confuse and inflame the jury via his threats to claim the victim was associated with the KKK and had used racial slurs. The State further contends that, in reality, it was not the race of the jurors that it based its challenges on but the personal perspectives and views potentially held by certain jurors that would make it

20

impossible for them to serve on the jury in the case at bar. The State notes that in *Duncan*, 802 So.2d at 552, the supreme court stated:

> [A] commentator observed that "[s]ome lower courts take the view that 'the race of a defendant as well as the race of the victim and key witnesses, is a relevant circumstance that the trial court may consider when determining whether defendant has raised an inference of purposeful discrimination sufficient to make a prima facie case.' " 5 Wayne R. LaFave, et al, *Criminal Procedure* § 22.3(d)(2nd ed. 2000 Supp.)(citing *State v. Locklear*, 349 N.C. 118, 505 S.E.2d 277 (1998)).

The State asserts that, in the case at bar, it was forced to consider the impact of racial slurs and hate-group affiliation on certain jury members because the Defendant insisted on spewing vile accusations that the victim was a racist KKK member. It contends that evidence of the victim's membership in the KKK and use of racial slurs was not deemed inadmissible until trial was underway; thus, it had no choice but to consider the impact such evidence would have on prospective jurors during jury selection. The State contends it "wisely" opted not to voir dire specifically on the topic at issue at length so as not to taint the jury pool against the victim. Instead, the State by its own admission, chose to strike all African-American jurors based solely on their race because of the prosecutor's personal assumptions. The prosecution could have questioned all prospective jurors on the issues of the use of the "N-word" and a person's affiliation with extremist groups such as the KKK without indicating any particular alleged facts in the case at bar. The State's response to this suggestion is that hindsight is twenty-twenty. True enough, but such truisms do not diminish the fact that the State could have proceeded with a wiser course of action than it chose and must be held accountable for the course of action it chose to pursue instead.

The State asserts Mitchell was not struck because she was African-American but because she admitted she would not be comfortable with hearing racial slurs.

The State asserts it also desired to strike her because she had back problems, and because her nephew had been accused of a crime. The prosecutor's own statement belies this assertion and demonstrates this was merely a pretext.

The State concedes that pursuant to La.Code Crim.P. art. 795 and *Duncan*, 802 So.2d 533, the Defendant's *Batson* challenge regarding Wiley and Duhon was timely. The State contends, however, there was no discrimination in its exclusion of Wiley and Duhon, despite the prosecutor's bold admission of his reason for striking all African-American jurors. This contention is untenable.

The State asserts that during voir dire, Duhon stated her brother had been convicted of murder; thus, she would not have been a desirable juror for the State in a murder case. Additionally, the State contends it did not like her body language and asserts Wiley was a firm believer in self-defense, as he stated: "You have to defend yourself, you know. It's your life, you know; you have to do whatever you have to do to preserve your life." The State contends that such comments made it more likely that he would buy into Defendant's self-help/self-defense claim.

The State notes that in *State v. Coleman*, 06-518, p. 8 (La. 11/2/07), 970 So.2d 511, 516, the supreme court stated: "Here, the explicit interjection of race, without further explanation, renders implausible any explanation other than that the decision to strike this prospective juror was not race-neutral, but was based specifically on the juror's race, in violation of the fundamental precepts of *Batson* and its progeny." The State contends it was very explicit in its explanation of its reluctance to question prospective jurors about the use of racial slurs and the victim's possible membership in the KKK. It contends its challenges were not based on race *per se* but on the probable perceptions of some jurors and their inability to see beyond inflammatory racial claims alleged by Defendant solely to tarnish the victim's reputation. Again, this argument is untenable in light of the

22

prosecutor's statement concerning his race-based motivation for excusing all African-American jurors.

The State additionally asserts Defendant cannot place race at issue and expect it to be completely ignored at its own peril. It asserts it tried, pre-trial, to have the evidence at issue excluded, but its efforts were futile. Thus, it argues, under these circumstances, no *Batson* violation occurred. Again, we reject this attempt to ignore the State's stated reason for striking all African-American jurors based purely on their race.

In Defendant's reply brief, he states *Batson* jurisprudence does not permit the State to substitute other reasons that might have justified a strike of all African-American jurors for the actual reasons they were struck. In support of this contention, Defendant cites the following from *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 2332 (2005):

> But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*See also State v. Snyder*, 98-1078 (La. 9/6/06), 942 So.2d 484, *rev'd on other grounds*, 552 U.S. 472, 128 S.Ct. 1203 (2008). Given the prosecutor's statement in the case at bar, we do not have to imagine or speculate on the reason the State challenged all African-American jurors. The reason was made quite clear. Defendant also cites *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. Cal. 2004), wherein the court stated: "But it does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the *real* reason they were stricken." Here, the real reason is abundantly clear.

23

As Defendant correctly contends, the State conceded it took race into consideration when striking African-American jurors. The State attempted to cure this fatal flaw by explaining it was not actually the race of the jurors that it based its challenge on but the personal perspectives and views potentially held by potential jurors that would make it impossible for them to serve. However, the predictions of which prospective jurors potentially held the beliefs were exclusively based on their race. In support of his argument, Defendant cites the following portion of *Batson,* 476 U.S. at 89 (citations omitted) (emphasis added):

> Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges "for any reason at all, as long as that reason is related to his view concerning the outcome" of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or **on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant**.

The Defendant also cites *J.E.B.*, 511 U.S. 127, 114 S.Ct. 1419, a paternity action wherein the female plaintiff used her peremptory strikes to remove nine of ten men from the jury. In that case, the Supreme Court stated that the equal protection clause prohibits discrimination in jury selection on the basis of gender or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. *Id.* The Supreme Court held that:

> [R]espondent maintains that its decision to strike virtually all the males from the jury in this case "may reasonably have been based upon the perception, supported by history, that men otherwise totally qualified to serve upon a jury in any case might be more sympathetic and receptive to the arguments of a man alleged in a paternity action to be the father of an out-of-wedlock child, while women equally qualified to serve upon a jury might be more sympathetic and receptive to the arguments of the complaining witness who bore the child." Brief for Respondent 10.
>
> We shall not accept as a defense to gender-based peremptory challenges "the very stereotype the law condemns." *Powers v. Ohio*, 499 U.S. [400], at 410, 111 S.Ct. [1364], at 1370 [(1991)].

24

Respondent's rationale, not unlike those regularly expressed for gender-based strikes, is reminiscent of the arguments advanced to justify the total exclusion of women from juries. Respondent offers virtually no support for the conclusion that gender alone is an accurate predictor of juror's attitudes; yet it urges this Court to condone the same stereotypes that justified the wholesale exclusion of women from juries and the ballot box. Respondent seems to assume that gross generalizations that would be deemed impermissible if made on the basis of race are somehow permissible when made on the basis of gender.

*Id.* at 137-40, 1426-27 (footnotes omitted).

In *Duncan*, 802 So.2d 533, voir dire was lengthy, spanning several days and involving twelve panels of prospective jurors. Near the end of voir dire, defense counsel voiced a combined *Batson-J.E.B.* challenge, asserting the State had used its peremptory challenges to exclude women and blacks. The trial court stated the following:

> My problem with this is you guys wait until we've released these people and they're gone and then you put me on notice and obligates me to have some--if you make some kind of showing and I've got to have a hearing, and the people are gone. If you're going to do this, you've got to put the Court on notice timely.
>
> . . . .
>
> [I]f they did show a pattern, they have waited until these people have all been released and gone before they even notify me. If they showed a pattern what could I do?

*Id.* at 546.

On appeal, the supreme court discussed the timeliness of defense counsel's objection as follows:

> "[t]he issue of the timeliness of *Batson* objections is difficult because a pattern of discrimination may not become evident in early stages of voir dire." *State v, Jacobs*, 99-0991 at p. 4 (La.5/15/01), 803 So.2d at 939. While counsel should preferably make the objection as soon as the discriminatory pattern is evident, "[c]ontemporaneous objections are not always feasible . . . because a pattern of invidious discrimination may not be evident until jury selection is complete." *Tursio v. United States*, 634 A.2d 1205, 1209-10 (D.C.App.1993).

Although *Batson* mandated that the challenging party make the objection timely, a *Batson* objection is timely if it is made before the jury is empaneled and sworn. *State v. Green*, 94-0887 at p. 20 (La.5/22/95), 655 So.2d 272, 285; *State v. Williams*, 524 So.2d 746 (La.1988); *see also* La. C. Cr. Pro. art. 795 B(1)(mandating that "[p]eremptory challenges shall be exercised prior to the swearing of the jury panel.") Defendant's global objection, albeit made near the end of the lengthy voir dire, was made before the jury was sworn and therefore was timely.

*Id.* at 546-47 (footnote omitted).

In *State v. Aubrey*, 609 So.2d 1183 (La.App. 3 Cir. 1992), the jury was selected on April 1, 1991, and each juror was told to return for trial on April 25, 1991. Although each juror was individually placed under oath, they were not sworn together as provided by La.Code Crim.P. art. 790 until April 25, 1991. This court noted the defendant did not object to the State's use of peremptory challenges on April 1, 1991. Further, no minute entry, objection within testimony, or written motion concerning the State's use of peremptory challenges was in the record. However, on April 19, 1991, the trial court held a hearing to determine the merits of the defendant's motion for mistrial based on his *Batson* objection. The trial court denied the motion as untimely. This court found the defendant's *Batson* objection was untimely, as it was not made contemporaneously with the jury selection process. This court then determined that had the defendant timely objected to the composition of the jury, his objection lacked merit. *See also State v. Porter*, 615 So.2d 507 (La.App. 3 Cir. 1993), *rev'd in part on other grounds*, 93-1106 (La. 7/5/94), 639 So.2d 1137.

We find the case at bar is similar to *Duncan*, 802 So.2d 533. The trial court erred in denying defense counsel's *Batson* challenge regarding prospective jurors Duhon and Wiley as untimely, as the objection was made prior to the swearing of the jury.

26

In *Coleman*, 970 So.2d 511, the State tentatively accepted Mason Miller, a black male, as a juror, but Miller was subsequently dismissed when the State used its third peremptory challenge to backstrike him. In defending its use of the peremptory challenge, the State asserted the following:

> The State did that because it needed to check information concerning Mr. Miller based on his employment. He advised he was a captain with the fire department in Bossier City. **Mr. Miller has filed a lawsuit against the city alleging institutional discrimination. Defense counsel voir dired on the race issue.**[3] **There is a black defendant in this case. There are white victims.** He said if he was 100 percent on the evidence, the death penalty was okay. With his body language, the State believes he is way passed(sic) where he self-described himself as a C but is actually a D or number four.
> _____
> [3]A review of the voir dire of the entire panel from which Miller was struck indicates that defense counsel did not voir dire on race.

*Id.* at 514.

The supreme court noted the State did not elaborate or attempt to explain what the lawsuit involved, what institutional discrimination meant, how bias might operate from the mere existence of the lawsuit, and Miller was never questioned about the impact the lawsuit would have on his ability to serve as a juror. The supreme court then noted that in his next statement, defense counsel indicated his reasons for striking Miller were race-related. The only other reasons proffered by the State for striking Miller was his body language as he responded to questions about his attitude toward capital punishment. Although body language has been held to constitute a race-neutral basis for defeating a *Batson* claim, the supreme court stated the explanation for striking Miller, when examined in the context of the State's overt reference to race, could not compensate for the specific racial reference. The supreme court held: "Once an inappropriate explanation involving racial considerations is made, a subsequent, valid reason for exercising the

27

peremptory challenge cannot purge the racial taint." *Id.* at 515-16. The supreme court further held:

> We find that the State consciously took race into account in its exclusion of Mr. Miller, thereby violating defendant's constitutional right to equal protection. Striking a single juror can constitute an equal protection violation. *State v. Collier*, 553 So.2d 815, 819 (La.1989); *United States v. Clemons*, 843 F.2d 741 (3rd Cir.1988) (striking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks); *United States v. David*, 803 F.2d 1567, 1571 (11th Cir.1986) ("the striking of one black juror for a racial reason violates the Equal Protection Clause"); *Fleming v. Kemp*, 794 F.2d 1478, 1483 (11th Cir.1986) ("nothing in *Batson* compels the . . . conclusion that constitutional guarantees are never abridged if all black jurors but one or two are struck because of their race"). A juror is entitled to be evaluated for service on a jury without reference to race. That fundamental guarantee is violated when the State consciously takes race into account in excluding a juror from service. In *State v. Harris*, [01-408 (La. 6/21/02), 820 So.2d 1471], the inappropriate invocation of race in excusing one juror results in the exclusion of one juror too many.

*Id.* at 516.

In *State v. Harris*, 01-408 (La. 6/21/02), 820 So.2d 471, the State challenged venireman Brown peremptorily. The State was called on to give a justification for the challenge and stated that Brown seemed a little confused as to the difference between the civil and criminal standard, he was the only single black male on the panel with no children, and he lived in Harvey, which was near where the offense took place. When addressing the issue, the supreme court stated:

> A finding that the state's reasons for dismissing Brown were based on race is further supported in the instant case by the overt statement of the prosecutor that she was challenging Brown because he was the "only single black male on the panel with no children." This justification explicitly places the defendant's race at issue, and is thus not race neutral. *See e.g., Goggins v. State*, 529 So.2d 649, 651-52 (Miss.1988) (challenge based on belief that blacks more favorable to black defendant invalid); *State v. Blackmon*, 744 S.W.2d 482, 486 (Mo.Ct.App.1988) (same); *see also Owens v. State*, 531 So.2d 22, 26 (Ala.Cr.App.1987) (rejecting trial court's conclusion that consideration of race among other factors race neutral). Furthermore, in similar situations, trial courts have properly disallowed attempted peremptory challenges, finding them mere pretext. *See, e.g., Marks v.*

> *State*, 581 So.2d 1182, 1187 (Ala.Cr.App.1990)(rejecting state's attempt to strike on claimed basis that venireman single and unemployed). Appellate courts have also found equal protection violations when prosecutors offer the venireperson's predominantly black neighborhood as justification, without connecting it to the case. *United States v. Bishop*, 959 F.2d 820, 825-26 (9th Cir.1992). The prosecutor in the instant case, in addition to giving thinly veiled reasons similar to those mentioned above, explicitly stated that she struck Brown because he was black.
>
> Accordingly, in its dismissal of Brown, the state has "consciously taken color into account," *Cassell v. Texas*, 339 U.S. 282, 295, 70 S.Ct. 629, 636, 94 L.Ed. 839 (1950), and violated the defendant's constitutional right to equal protection.

*Id.* at 477.

When giving reasons for the State's use of peremptory strikes to excuse all African-American jurors in the case at bar, the prosecutor said: "And the fact that Ms. Mitchell is an African-American, I didn't want to run the risk of putting her on this jury -- and it applies to the rest of them also." After careful review of the record, it is abundantly clear that the State's articulated reason for the peremptory strike of all African-American jurors was race-based. *See Coleman*, 970 So.2d 511; *Harris*, 820 So.2d 471. *C.f. J.E.B.*, 511 U.S. 127. Further, the State's attempt, in its brief to this court, to set forth legitimate reasons for striking Duhon and Wiley are of no moment. The reasons presented by the State in brief to this court were not set forth in the trial court at the time the *Batson* challenge was raised, and, once an inappropriate explanation involving racial considerations is made, a subsequent valid reason for exercising the peremptory challenges does not purge the racial taint. *See Coleman*, 970 So.2d 511; *Paulino*, 371 F.3d 1083.

We find that the manner in which the State exercised its peremptory challenges in this case, based on race, resulted in a violation of Defendant's constitutional rights, and this error raises serious equal protection issues affecting the rights of both Defendant and the excused prospective jurors. This error is a

structural one, affecting the framework within which the trial proceeded; thus, under the settled law and jurisprudence Defendant is entitled to a new trial. *Coleman*, 970 So.2d 511.

Because Defendant's convictions are reversed and his sentences are vacated, we need not address the remaining assignments of error.

**DECREE**

**CONVICTIONS REVERSED; SENTENCES VACATED;REMANDED FOR A NEW TRIAL.**